[Civ. No. 10449. Fourth Dist., Div. Two. July 29, 1971.]

MIDDLEBROOK-ANDERSON CO. et al., Plaintiffs and Appellants, v. SOUTHWEST SAVINGS AND LOAN ASSOCIATION et al., Defendants and Respondents.

**COUNSEL**

Wenke, Kemble & Burge and John R. Schilling for Plaintiffs and Appellants.

Nagel, Regan & Davidson and Stephen C. Drummy for Defendants and Respondents.

**OPINION**

**GABBERT, J.**—The plaintiffs appeal from a judgment of dismissal entered after defendants' general and special demurrers were sustained without leave to amend in this complicated land development action. Plaintiffs are two California corporations, doing business as Middlebrook-Anderson Co., a partnership, hereinafter referred to as "seller."

The sellers owned real property consisting of 28 lots in Orange County. It entered into a land sale contract with certain developers, hereinafter referred to as "buyers," who are not before us in this action. An escrow at a bank was opened between seller and the buyers; the instructions specified the sale price to be $365,000, which was to be partially paid by a purchase money deed of trust in the amount of $169,500. This deed was to be second and junior to a construction loan to be obtained at some later time by the buyers.

During a period of several months buyers negotiated for a construction

loan from defendant Southwest Savings and Loan Association, hereinafter referred to as "lender." Defendant Western Escrow Company was the escrow agent for the buyers and the lender. The buyers represented to the seller that the bank escrow would have to be revised to provide for a purchase money deed of trust in favor of seller in the sum of $69,500 and to allow the lender to obtain priority over seller's deed of trust by priority of recording. The bank escrow between seller and buyers was amended accordingly.

After these terms were agreed to by the seller and the buyers, the construction loan was consummated. Western Escrow prepared 28 deeds of trust in favor of lender, with Western named as trustee, each in the amount of $52,300. A deed of trust in favor of seller in the amount of $69,500, expressly stating it was junior to the lender's deeds of trust, was also prepared. These 29 trust deeds were recorded on April 22, 1966. Three days later, to repair the distortion caused by the $100,000 reduction in the apparent size of the purchase money loan, the $69,500 deed was reconveyed and 28 new ones prepared and recorded, each in the amount of $6,053.

The third amended complaint alleges the lender disbursed $1,464,400 into a construction loan account, and allowed the buyers to use $300,000 of this for purposes other than construction improvements. When the loan funds ran out in November 1966, the buyers abandoned the unfinished apartment houses on the property. In the same month, Western Escrow gave notice of default and election to sell under lender's trust deeds. Seller tendered payment of the due principal, interest, and late charges to cure the default, but Western and lender demanded in excess of $50,000, in addition, to repay lender for sums it claimed it had expended for repairs caused by vandalism on the property and completion of the construction. Lender purchased the property at a series of foreclosure sales in April and May 1967, remained in possession and collected rents for a period of time, and then sold the properties to members of the public not parties to this action.

This litigation was commenced by a complaint filed before the foreclosure sales were complete. After plaintiffs' third amended complaint, attempting to state seven different causes of action against Southwest Savings and Loan and Western Escrow was filed, the trial court sustained defendants' general demurrers to the complaint on grounds of failure to state a cause of action, and 44 special demurrers on grounds of uncertainty.

Plaintiffs' causes of action are based essentially on the failure of lender to limit the use of the loan funds to construction purposes. The theories

of recovery and remedies sought in the respective numbered causes of action are:

(1) a restoration of the priority of seller's trust deeds;

(2) damages for rendering seller's trust deeds valueless by foreclosure on lender's first trust deeds;

(3) either restoration of priority or money damages based on lender's knowingly permitting the use of $300,000 for nonconstruction purposes;

(4) either restoration of priority or damages based on seller's status as a third party beneficiary of the construction loan contract between lender and the buyers;

(5) setting aside the trustee's foreclosure sale of the property, or damages, based on lender's and Western Escrow's refusal to accept seller's tender of principal, interest and late charges to cure the default on the construction loan;

(6) an accounting of funds received by lender from the property after the foreclosure sales, both as rents and proceeds of re-sales, and application of such funds to repayment of the construction loan, plus reasonable rental value of the property for the period lender was in possession;

(7) (labeled "tenth" because the seventh, eighth, and ninth causes of action named only the buyers) punitive damages based on alleged malice involved in every act of the defendants.

The pleadings allege an original contract existed between the seller and buyers; the escrow at the bank was solely between seller and buyers; the sellers were to receive a purchase money trust deed which would be junior to a construction loan that was to be negotiated. Thereafter negotiations with the lender by the buyers resulted in a commitment by the lender to the buyers on the condition, as represented by the buyers to the seller, that the lender would make a construction loan and would require documents to show the buyers had made a greater cash investment in the property than originally contemplated and would require subordination of seller's trust deed by priority of recording rather than through a formal subordination agreement.

The complaint further alleges the buyers represented to the seller the funds received from the lender would be used exclusively for construction of improvements on the property and, based on these representations, the seller agreed to the terms. The buyers then entered into the escrow with Western Escrow which, acting as agent for the buyers and the lender, received a copy of the escrow instructions between the seller and buyers.

The seller alleges the lender had knowledge of the second trust deeds taken by the seller and had a duty to inquire of the seller as to the terms and conditions under which the seller agreed to accept a junior lien. The complaint further alleges the lender voluntarily undertook to control disbursements from the construction loan fund and that the seller did not attempt to follow the progress of the construction or status of disbursements because it relied on such control by the lender, who knew and intended that seller so rely.

The seller continues that the lender owed a duty to seller because of lender's conduct which induced the seller to "subordinate" its lien, because of lender's voluntary assumption of control of disbursements and because of the lender's knowledge of the security interest of the seller and knowledge that the seller would subordinate its lien on condition the loan funds were to be used only for construction improvements. Seller alleges the lender disbursed $300,000 in funds which were not for construction purposes, in wanton, reckless disregard of the security interest of seller.

The complaint also alleges that by reason of these improper disbursements the construction of the project was not completed and the market value of the property did not increase through the construction of improvements to a sufficient extent to support the security interests of both seller and lender. The value of seller's security interest in the property was thus diminished to the extent of the alleged wrongful disbursements. The seller finally contends that at the time of the commencement of the case the unpaid balance on the trust deeds in favor of sellers was in the sum of $141,250.23, plus interest.

All of plaintiffs' causes of action depend upon a conclusion that seller's agreement to take a second trust deed constituted a subordination agreement or an agreement in the nature of a subordination agreement. Lender, on the other hand, claims seller got what it bargained for—a second trust deed—and thus had no prior lien to subordinate. Lender would thus conclude no priority existed which could be restored, the seller could not state any cause of action, and the trial court correctly sustained the demurrers.

As we state below, we conclude that the duties owed by a lender to a seller under a formal subordination agreement do not differ from the duties owed by a lender to a seller when the lender obtains priority over the seller under an agreement by the seller to record after the lender. We thus conclude that, in part, the complaint is sufficient to withstand defendants' general demurrers.

Subordination is, strictly speaking, a status, not an agreement or

form of litigation. It refers to the establishment of priority between different existing encumbrances on the same parcel of property, by some means other than the basic priority involved in the concept of "first in time, first in priority," or the automatic priority accorded purchase money liens. (See Lascher, *Subordination Clauses in Court: Is California Unfair to Unfairness?* 1 San Fernando Valley L.Rev. 1.)

By statute, a purchase money deed of trust is prior to other liens on real property. (Civ. Code, § 2898.) But banks and savings and loan institutions may not lend money on the security of real property unless they hold first liens. (Fin. Code, §§ 1413, subd. (d), 7102, subd. (a), 1560.) The two common methods of arranging for the commercial lender to hold the first lien include: (1) an express subordination agreement in which the seller agrees to make his lien junior to the lender's; (2) recording the lender's trust deed before the seller's.

Both methods of giving a lender a prior lien, whether by express subordination agreement or by priority of recording, are used to obtain a quicker sale and a higher price for the land. A reading of the commentators[1] suggests lending institutions may prefer the latter method over written subordination agreements because of the reluctance of courts to enforce express written agreements which are deemed to be unfair to the seller. (See *Handy* v. *Gordon*, 65 Cal.2d 578 [55 Cal.Rptr. 769, 422 P.2d 329, 26 A.L.R.3d 848].) This latter type of subordination situation has been referred to as "automatic subordination."

In the cases that have appeared in the California courts the automatic type of subordination has been said to be the legal problem-child. The negotiated agreement for subordination has seemingly not caused difficulty and is generally absent from the decided reports. (See comments in articles set out in fn. 1.)

In the case before us, the record discloses an automatic subordination agreement in which the seller, after negotiating a sale, agreed to a subordination by recording after the lender. Differing positions have been taken by the California appellate courts with respect to these automatic subordination agreements made at the time of sale. Several cases have refused to recognize automatic subordination; others have accepted and enforced it. Remaining cases have applied other tests to determine whether

---

[1]See Eisenhardt, *Subordination of Purchase-Money Security,* 52 Cal.L.Rev. 157; Miller, Starr and Regalia, *Subordination Agreements in California,* 13 U.C.L.A. L.Rev. 1298; Lascher, *Subordination Clauses in Court: Is California Unfair to Unfairness?, supra,* 1 San Fernando Valley L.Rev. 1; Lefcoe, Land Finance Law (1969) at page 536; 26 A.L.R.3d 855.

the courts would place their stamp of approval upon the particular arrangement of the parties.[2]

On the basis of the allegations in the complaint, the project in the case at bench would appear to be a typical automatic subordination arrangement as found in *Miller* v. *Citizens Sav. & Loan Assn., supra,* 248 Cal.App.2d 655. As we interpret the pleadings, the subordination agreement shows the parties intended to enter into an arrangement of subordination whereby the seller relied upon the responsibility of the lender to make voucher payments only for construction purposes and the reliance of the seller was known to the lender.

The basic thrust of plaintiffs' complaint is that the automatic subordination should be voided because of the misapplication of a portion of the construction loan fund, in that the lender failed to comply with the conditions which occasioned plaintiffs' agreement to subordinate. This theory is supported by a number of cases and is endorsed by certain of the text writers mentioned herein.

In *Collins* v. *Home Savings & Loan Assn., supra,* 205 Cal.App.2d 86, the lender had exercised his power of sale, asserting priority based on the subordination agreement between plaintiff and the defaulting buyer. The agreement contained a limitation that the loan proceeds were to be used for construction purposes. The plaintiff seller sought a declaration that the agreement did not alter the priorities, in part, because the buyer had misused the loan funds. The trial court found that the lender had disbursed funds knowing that the buyer would use them for unauthorized purposes. Judgment was entered for the seller and against the lender for the principal amount of the purchase money note, plus interest, and the appellate court affirmed, stating in part: "The trial court . . . could properly infer that it would be rather incredible for respondents . . . to have subordinated the lien of their purchase money deed of trust to those of other tremendously larger liens . . . which would have made respondents' trust

---

[2]The seller relies upon a number of cases holding that, on other—though often similar—facts, the lender may owe a duty to the seller, where the lender had knowledge of the subordinated position of the security held by the seller and the reliance of the seller on the proper disbursement of funds for construction purposes by the lender. These cases include: *Handy* v. *Gordon, supra,* 65 Cal.2d 578; *Miller* v. *Citizens Sav. & Loan Assn.,* 248 Cal.App.2d 655 [56 Cal.Rptr. 844]; *Radunich* v. *Basso,* 235 Cal.App.2d 826 [45 Cal.Rptr. 824]; *Collins* v. *Home Savings & Loan Assn.,* 205 Cal.App.2d 86 [22 Cal.Rptr. 817].

The lender relies upon several cases which, on their facts, hold the lender owed no duty to the seller with respect to disbursements for construction purposes. These cases are: *Weiss* v. *Brentwood Sav. & Loan Assn.,* 4 Cal.App.3d 738 [84 Cal.Rptr. 736]; *Gill* v. *Mission Sav. & Loan Assn.,* 236 Cal.App.2d 753 [46 Cal.Rptr. 456]; *Matthews* v. *Hinton,* 234 Cal.App.2d 736 [44 Cal.Rptr. 692]; *Spaziani* v. *Millar,* 215 Cal.App.2d 667 [30 Cal.Rptr. 658].

deed of questionable worth. . . . [T]he trial court could, and presumably did, infer that the only reason for respondents' subordination of their lien was the expectation that if payments were advanced by appellant solely for construction purposes, the liens superior to their own would increase in value only as the property under development enjoyed a corresponding increase in value because of the accompanying progress in the work of construction." (205 Cal.App.2d at p. 98.)

The case of *Radunich* v. *Basso, supra,* 235 Cal.App.2d 826, held the sellers' lien superior where the lender knew of the variance between the actual intended use for the loan proceeds and the use restriction in the subordination clause. The lender was thus on notice of a possible violation of the agreement and under a duty to ascertain the true facts from the seller. His failure to investigate was thus held to be negligence.

In *Miller* v. *Citizens Sav. & Loan Assn., supra,* 248 Cal.App.2d 655, the appellate court, in reversing the decision of the trial court granting a motion of defendant lender under Code of Civil Procedure section 631.8, held that since the lender was aware of the limitations contained in the subordination arrangement, it could not claim priority for any monies advanced for purposes outside those permitted.

Respondents assert their nonliability on four grounds: (1) the lender had no duty to supervise the distribution of loan funds (*Gill* v. *Mission Sav. & Loan Assn., supra,* 236 Cal.App.2d 753); (2) there was no privity of contract between lender and seller (*Matthews* v. *Hinton, supra,* 234 Cal.App.2d 736); (3) since no "subordination agreement" was alleged, seller could have suffered no loss of priority; and (4) no public policy basis exists for imposing a duty on the lender (*Gill* v. *Mission Sav. & Loan Assn., supra*). Respondent cites two other cases in support of the asserted grounds: *Weiss* v. *Brentwood Sav. & Loan Assn., supra,* 4 Cal.App.3d 738, and *Spaziani* v. *Millar, supra,* 215 Cal.App.2d 667.

In light of the facts set forth in the complaint, however, we find insufficient merit in these arguments to prevent a trial of the matter on the merits. We find compelling reasons to the contrary.

*Gill* involved an appeal from a judgment of dismissal upon an order sustaining a demurrer with leave to amend, no amendment having been filed. The issue was whether the lender owed a duty to the sellers to manage and supervise the distribution of loan funds so that these funds would be used solely for construction purposes. The court concluded that because of the lack of privity of contract and the fact that plaintiffs did not allege that defendant had voluntarily undertaken to supervise the distribution of the loan funds, the complaint for damages was properly demurrable.

In *Gill* the complaint was that the lender had acted negligently in failing to supervise and manage the loan funds. As stated by the court in *Gill*, "Nowhere in the first amended complaint does it appear that the defendant agreed with anyone to manage or supervise distribution of the loaned funds, assumed to do so, actually undertook such, or was required by statutory law or regulation to so manage or supervise. Nor is there any showing of a voluntarily assumed relationship between defendant and plaintiffs from which such an obligation might arise." (236 Cal.App.2d at pp. 756-757.)

Such allegations do appear in the pleading in the case at bench. Moreover, the damage claim in the complaint in *Gill* rests on a different legal theory than the claim of loss of priority here involved. The former is grounded on traditional negligence concepts while the latter is based on principles of contract law. Underlying the latter theory, the lender's claim to priority flows from the agreement between the seller and the buyer. It is only as a result of the seller's waiver of his statutory right to a first lien that the lender achieves priority. Thus, the lender is a third party beneficiary in the seller-buyer agreement, but only to the extent that it abides by the conditions of subordination. If the lender does not comply with the seller's conditions it does not achieve priority. Since one condition to priority is the proper use of the construction loan funds, the priority of the construction loan lien does not vest until such time as the funds are applied to the construction purpose. (See Cal. Real Estate Secured Transactions (Cont.Ed.Bar) § 5.13 at p. 215.) This latter theory was not before the *Gill* court.

*Matthews* v. *Hinton, supra,* 234 Cal.App.2d 736, involves the same problem as *Gill,* namely, the cross-complaint was seeking damages rather than a restoration of priority. Moreover, the court in *Matthews,* concluded that the transaction with the lender produced a new agreement which effectively eliminated any restrictions on the use of the loan proceeds. (See *Miller* v. *Citizens Sav. & Loan Assn., supra,* 248 Cal.App.2d 655, 663-664, fn. 5.) Finally, the parties in *Matthews,* were lessors, a lessee and a lender and, therefore, the case did not involve a purchase money second trust deed. For these reasons *Matthews* is distinguishable from the within action.

Lender contends since the case before us does not involve a "subordination agreement" there was no loss of priority and therefore as a matter of law plaintiffs may not have their lien declared to be prior to the construction loan lien. In support of this argument defendants rely on a treatise, Current Law of California Real Estate, volume 2, by Messrs. Miller and Starr. The same authors have restated their position in 13 U.C.L.A. L.Rev. 1298, 1301 to the effect that if the seller agrees in the deposit receipt agreement

or the escrow instructions that the buyer may obtain a construction loan which will be recorded as a first trust deed and the seller's purchase money trust deed is made junior by virtue of the time of its recording, then a "true" subordination does not result. The problem, it is said, ". . . does not involve alteration of lien priority; that is, it does not involve the subordination of an earlier lien to a later lien, because by the execution of the purchase transaction the priorities are determined by the initial creation and recordation of the liens. Since the seller at no time has a 'prior' lien, he is not 'subordinating' his lien but merely agreeing to accept junior security. The problem, therefore, is primarily one of contract law between the buyer and the seller and not one of lien law between the seller and the lender." (P. 1301.)

In our view there is no justification, legal or otherwise, which would call for a different result whether the seller in a joint transaction records first and then agrees that his lien will be subordinated or whether he agrees that the lender may achieve priority through first recording. In California Real Estate Secured Transactions (Cont.Ed.Bar) *supra*, section 5.16 at page 217 the author expressly disagrees with the Miller and Starr position stating: "This author disagrees with Miller and Starr due to the prevailing policy of title companies of recording the subordinating lien before the subordinated deed of trust. [citation]. ¶In Conley v. Fate (1964) 227 CA2d 418, 38 CR 680, a seller agreed to accept a second deed of trust for a portion of the purchase price, and the court properly referred to this as being subordinate to the construction loan, and further referred to the pertinent portion of the deposit receipt as a subordination clause. ¶In the event the vendor is required to finance partially the purchase of his property, through either a second deed of trust or a subordinated first deed of trust, there should be no difference in his status based on the time of recording of the two encumbrances. On some occasions the purchase-money deed of trust held by the vendor will be reconveyed and rerecorded immediately after recordation of the subordinating encumbrance. [citation]. Therefore, if the institutional lender knows that the vendor is to finance a portion of the purchase price, the institutional lender should incur the same liabilities for misapplication of funds, whether the vendor holds a second deed of trust by virtue of reconveyance and rerecordation or a first subordinated by agreement without a change in the order of recording. But see Spaziani v. Millar, (1963) 215 CA2d 667, 30 CR 658."

Respondent finds support for a result contrary to that which we have reached in *Spaziani* v. *Millar, supra,* 215 Cal.App.2d 667, and in Miller, Starr and Regalia, *Subordination Agreements in California, supra,* 13 U.C.L.A. L.Rev. 1298, 1309-1312. *Spaziani* states: "The deed of trust held by the defendant loan company was a first deed of trust; the deed of

trust held by the plaintiff was a second deed of trust; by virtue of these facts the latter was subordinated to the first; and the purpose for which the first loan had been made bore no relationship to its priority." (P. 681.)

The result in *Spaziani* is approved in the law review article mentioned above, which reasons: "The seller's lien is not usually recorded until title has passed to the buyer and the lien of the construction lender has been recorded; the seller at no time has a prior lien to be 'subordinated.' If the proceeds of the construction loan are not applied as required by the contract between the seller and the buyer, there is no failure of a condition of subordination, and the seller's recourse is limited to an action for breach of contract against the buyer or breach of instructions against the title company. The seller should have no recourse against the lender unless he can establish a contractual privity with the lender." (Fn. omitted; 13 U.C.L.A. L.Rev. at p. 1309.)

While *Spaziani,* in all candor, must be considered closely on point, nevertheless there are certain distinguishing features which we think sufficient to permit us to reach a contrary position, and to allow the case before us to go to trial on the merits. The *Spaziani* court did not find a subordination agreement between the lender and the seller; the application of the rule as to the lender's duty to the seller was a conclusionary statement, made without citation of authority or reasoning to support it. Further, the loan involved was not a construction loan but was denominated a "purchase assistance" loan. *Spaziani* principally turned on the lack of duty on the lender to inform the buyer that the loan involved was not a construction loan. Nor has *Spaziani* been cited for its point that there was no subordination in a second trust deed situation. Additionally, even in *Spaziani* the nonsuit as to the escrow company was reversed, so that relief was given the seller.

Although *Spaziani* is apparently the closest case on point, other analogous cases suggest a different result. *Conley* v. *Fate,* 227 Cal.App.2d 418 [38 Cal.Rptr. 680], refused to specifically enforce a land sale contract in which the seller promised to take a second trust deed junior to a construction loan. One of the reasons the court gave was the fact the contract contained no specification of the purpose and nature of the construction loan described, offering no protection to the seller's junior security. This concern for the seller's security indicates there should be no difference between formal subordination of a first trust deed and an agreement to take a second trust deed. Two commentators support this view and are critical of *Spaziani* and the law review article cited by defendants. (Cal. Real Estate Secured Transactions (Cont.Ed.Bar)

*supra,* § 5.16 at p. 217; Comment, *Subordination of Purchase-Money Security,* 52 Cal.L.Rev. 157, 164-170.)

Finally, in our opinion strong public policy reasons to protect the seller in subordination situations are set out in *Handy* v. *Gordon, supra,* 65 Cal. 2d 578, 581: "Although the parties to a contract of sale containing a sub-ordination clause may delegate to the vendee or third party lenders power to determine the details of subordinating loans, an enforceable subordina-tion clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security. [Citations.] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land, maximum amounts so that the loans will not exceed the contemplated value of the improve-ments they finance, requirements that the loans do not exceed some specified percentage of the construction cost or value of the property as improved, specified amounts per square foot of construction, or other limits designed to protect the security. Without some such terms, however, the seller is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price. . . .

"The contract alleged in the complaint does not afford defendants any additional protection. [Fn. omitted.] Although the proceeds of the sub-ordinating loans are to be used primarily for construction and refinancing, any funds that are not needed for these purposes may be disbursed to plain-tiff. The absence of restrictions on plaintiff's use of these funds leaves de-fendants without assurance that all of the proceeds of the loans will be used to improve the land that represents their security. Because the limits on the loans are expressed as absolutes, they provide no assurance that the amounts of the loans will not exceed the value the improvements add to the security. Moreover, the limits are maximums per lot, and plaintiff has unrestricted discretion in determining the size of each lot. Thus de-fendants are not assured that the total amount of the subordinating loans will be kept low enough to enable them to protect themselves by bidding on the property if the senior liens are foreclosed. [Fn. omitted.] Finally defendants did not receive a down payment that would effectively cushion their position, and the first payment of principal is deferred until three years after the close of escrow.

"Thus, the contract leaves defendants with nothing but plaintiff's good faith and business judgment to insure them that they will ever receive any-thing for conveying their land. Such a contract is not as to them 'just and reasonable' within the meaning of Civil Code section 3391."

It has been pointed out by many courts and commentators that as between the seller and the lender, the lender is by far in the better position to con-

trol the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on-site inspections. It is common for lenders to control disbursements, since they, too, have an interest in preventing misuse of loan proceeds (see 52 Cal.L.Rev. 157-158, fn. 5.) If the lender loses priority as a result of improper disbursements, it remains in a position to redeem the seller's purchase money lien and foreclose on the junior construction lien and thereby own the property for a price presumably less than the market value. Also, loan proceeds would be at least partially recouped by the improvements made. The seller, on the other hand, is normally not in a position to protect himself by redemption of the larger construction lien in the event the lender were to obtain priority. After redemption, the lender can obtain a deficiency judgment against the defaulting developer whereas the seller, holding a purchase money security interest, would be barred by Code of Civil Procedure section 580b, if he tried to recover a deficiency judgment against the developer. (*Kistler* v. *Vasi,* 71 Cal.2d 261, 263-264 [78 Cal.Rptr. 170, 455 P.2d 106].) The lender is in a far better position to absorb any loss since such contingencies may be provided for in its profit and loss estimates. Finally, allocation of the loss to the lender would encourage the parties to provide for the various contingencies by contract.

■ An implied agreement in the instant case can and, in equity, should be spelled out from lender's alleged actual knowledge of the provisions of the seller's lien in general, and of the subordination therein in particular. In the superior position of a financial institution constantly engaged in professional construction lending, Southwestern had no reason to believe their trust deed conferred any lien to which the fee was subordinate other than to the extent of money spent for construction purposes. Its loan under the circumstances cannot be viewed other than as subject to the fair application of the construction funds. Accordingly, we conclude that such lien as the trust deed might have conferred on the lender should not be advanced or preferred over the seller.

Here, it is alleged the lender, with full knowledge of the subordinated lien of the seller, disbursed the funds without limitation. Its disinterest in the application of the funds not used for construction amounted to a failure to prevent the loss sustained by seller—who, in the vernacular of the market place, was "wiped out." The particular equities discussed above incline us to the conviction that the philosophy of fair dealing as expressed in *Handy* v. *Gordon, supra,* 65 Cal.2d 578, is most appropriately invoked here.

We hold the actions of the parties here, if proved as alleged, did create

a subordination agreement, and the lender's failure to protect seller's security interest gives seller a cause of action; the validity of the first, second, and third causes of action are supported by the cases. (*Miller* v. *Citizens Sav. & Loan Assn., supra,* 248 Cal.App.2d 655; *Radunich* v. *Basso, supra,* 235 Cal.App.2d 826; *Collins* v. *Home Savings & Loan Assn., supra,* 205 Cal.App.2d 86.)

■ The fourth cause of action is based on the theory seller was a third party beneficiary of the construction loan agreement between lender and the buyers. Lender, to support its demurrer, asked the court to take judicial notice of the construction loan agreement filed with certain answers to interrogatories. A provision of this agreement expressly states it is to be for the benefit of lender and buyers only. The court may take judicial notice of documents in its file when considering a demurrer. (*Saltares* v. *Kristovich,* 6 Cal.App.3d 504 [85 Cal.Rptr. 866]; *Able* v. *Van Der Zee,* 256 Cal.App.2d 728 [64 Cal.Rptr. 481].) But the meaning of this agreement given the wide latitude of parol evidence admissible in interpreting a contract (see *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641]), is not the type of matter made judicially noticeable by Evidence Code section 452. To go beyond notice of the existence of a document to an interpretation of its meaning constitutes improper consideration of evidentiary matters. (*Tyree* v. *Epstein,* 99 Cal.App.2d 361 [221 P.2d 1002]; but cf. *Watson* v. *Los Altos School Dist.,* 149 Cal.App.2d 768, 771 [308 P.2d 872].) We thus do not consider this agreement and hold the fourth cause of action to be regular on its face.

■ The fifth and sixth causes of action turn on lender's refusal to accept seller's tender of due principal, interest, and late charges to cure buyers' default. If the refusal was wrongful, the trustee's foreclosure sale was invalid and seller is entitled to the relief it seeks in these causes of action. The lender rejected seller's tender because it did not include the amount in excess of $50,000 which had been spent to repair and complete the apartments; plaintiffs allege defendants had no right to demand this sum because it was not stated in the notice of default. The notice need not, however, state the amounts which are in default; it need only describe the nature of the breach. (Civ. Code, § 2924; *Engelbertson* v. *Loan & Bldg. Assn.,* 6 Cal.2d 477, 478-479 [58 P.2d 647].) Rejection of the tender thus was not wrongful and the trustee's sale was valid; sustaining the general demurrer without leave to amend was proper on the fifth and sixth causes of action.

■ All of seller's causes of action, as discussed herein, posit the existence of a subordination agreement and seek recovery for its breach. This amounts to an action on a contract: the punitive damages sought in the tenth cause of action are not recoverable in an action on a contract. (Civ. Code, § 3294.)

■ The court sustained defendants' special demurrer, which specified 44 instances of uncertainty, without leave to amend. If the elements of a cause of action are stated, it is an abuse of discretion to deny leave to amend where the defect is one of form. (*Wennerholm* v. *Stanford Univ. Sch. of Med.,* 20 Cal.2d 713, 718-719 [128 P.2d 522, 141 A.L.R. 1358]; *Cunningham* v. *Burbank Bd. of Realtors,* 262 Cal.App.2d 211, 216 [68 Cal. Rptr. 653]; *Kauffman* v. *Bobo & Wood,* 99 Cal.App.2d 322, 323 [221 P.2d 750].)

Thus, since a subordination agreement is sufficiently alleged in the pleadings and supported in law, the first, second, third and fourth causes of action are valid and the judgment of dismissal should be reversed as to them. We hold the demurrer was properly sustained as to the fifth, sixth, and tenth causes of action. (Only the fifth, sixth, and tenth causes of action purport to state a claim against defendant Western Escrow.) The judgment of dismissal is reversed with directions to the trial court to overrule the general demurrer as to the first, second, third and fourth causes of action, and allow respondent a reasonable time within which to answer the third amended complaint.

Without ruling on the worth, if any, of the causes of action, set forth in the third amended complaint, seller should be afforded an opportunity to present the case on the merits. We do not decide, however, the valid portions of the complaint may not be subject to special demurrer, and the trial court may in its discretion require further clarification of any uncertainties or ambiguities. (*Wennerholm* v. *Stanford Univ. Sch. of Med., supra,* 20 Cal. 2d 713, 720; *Guilliams* v. *Hollywood Hospital,* 18 Cal.2d 97, 104 [114 P.2d 1].)

The judgment is reversed in part and affirmed in part as set forth herein.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

A petition for a rehearing was denied August 18, 1971, and respondents' petition for a hearing by the Supreme Court was denied September 22, 1971.