Filed 10/19/18; Certified for Publication 10/31/18 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| BEAR CREEK MASTER ASSOCIATION, | |
| Plaintiff, Cross-defendant and Appellant, | E066588 |
| | (Super.Ct.No. MCC1500389) |
| v. | O P I N I O N |
| SOUTHERN CALIFORNIA INVESTORS, INC., | |
| Defendant, Cross-complainant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Raquel A. Marquez, Judge. Reversed.

The Perry Law Firm, Michael R. Perry, Larry M. Roberts, and Evan H. Goldsmith for Plaintiff, Cross-defendant, and Appellant.

Jackson Tidus and F. Scott Jackson for Jackson Tidus as Amicus Curiae on behalf of Plaintiff, Cross-defendant, and Appellant.

1

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Brant H. Dveirin, Edward J. Corwin, and Allison Ann Arabian for Defendant, Cross-complainant, and Respondent.

## I. INTRODUCTION

In this case, the parties dispute which of their recorded liens against a golf course property has priority. In 2013, defendant, cross-complainant, and respondent, Southern California Investors, Inc. (SCI), recorded a third deed of trust against the golf course property. In 2014, plaintiff, cross-defendant, and appellant, Bear Creek Master Association (BCMA), a homeowners association, recorded an assessment lien against the golf course property. The trial court entered judgment on the pleadings in favor of SCI after determining that SCI's third deed of trust had priority over BCMA's later-recorded assessment lien. BCMA appeals, claiming its assessment lien has priority.

BCMA owns and is responsible for maintaining the common areas within the Bear Creek Development, a common interest development in Murrieta. The golf course property is adjacent to but is not part of the Bear Creek Development. In 1984, the developer of the Bear Creek Development and the golf course property recorded a set of covenants, conditions, and restrictions governing the golf course property (the GCC&R's.) The GCC&R's granted BCMA the right to maintain the golf course property in accordance with the GCC&R's, if its owner failed to do so. To this end, the GCC&R's granted BCMA a "claim of lien" against the golf course property to secure certain costs that BCMA later incurred in maintaining the golf course property. After SCI recorded its

2

third deed of trust in 2013, BCMA incurred costs in maintaining the golf course property and recorded its assessment lien.

BCMA claims its assessment lien was created by the GCC&R's and "relates back" to the 1984 recordation of the GCC&R's. (Civ. Code, § 2884.)[1] We disagree. According to the lien provisions of the GCC&R's, the assessment lien was neither created nor perfected until it was recorded in 2014. Nonetheless, we agree with BCMA's alternative claim that its assessment lien has priority over SCI's previously-recorded third deed of trust pursuant to the priority and subordination provisions of the GCC&R's, even though the assessment lien was recorded after SCI's third deed of trust was recorded.

## II. FACTS AND PROCEDURE[2]

A. *The GCC&R's Governing the Golf Course Property*

As indicated, BCMA owns and is responsible for maintaining the common areas within the Bear Creek Development, a common interest development comprised of 620 single-family homes and townhomes in Murrieta. The golf course property is adjacent to but is not part of the Bear Creek Development. In the early 1980's, Bear Creek, Ltd. developed the Bear Creek Development and the golf course property. In February 1984, Bear Creek, Ltd. executed the GCC&R's, and the GCC&R's were recorded on March 2,

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] The facts are taken from the complaint, cross-complaint, the documents attached to those pleadings, and judicially noticed recorded instruments.

3

1984.  Bear Creek, Ltd. sold the golf course property on March 2, 1984, and the grant deed for that original sale incorporated the GCC&R's.

The GCC&R's require the golf course property owner to maintain the golf course property "in a clean and attractive condition" and grant BCMA the right, but not the obligation, to enter upon the golf course property in order to remedy its owner's failure to maintain it.  To these ends, the GCC&R's created a "claim of lien" against the golf course property in order to reimburse BCMA for certain *future costs* it incurred (including interest, collection costs, and attorney fees) in maintaining the golf course property in accordance with the GCC&R's.

Section 3 of article III[3] of the GCC&R's states:  "*There is hereby created a claim of lien,* with power of sale, on the Golf Course Property to secure payment to [BCMA] of any and all Assessments levied against any and all owners of the Golf Course Property pursuant to this Declaration, together with interest thereon as provided for in this Declaration, and all costs of collection which may be paid or incurred by the Association in connection therewith, including reasonable attorneys' fees. . . .  [¶]  . . .  [¶]  . . . Upon such recordation of a duly executed original or copy of such a claim of lien, the lien claimed therein shall immediately attach and become effective in favor of the Association [BCMA] as a lien upon and against the Golf Course Property. . . .* Any such lien may be

---

**3** References to sections of the GCC&R's are to sections of article III of the GCC&R's.

foreclosed by appropriate action in court or in the manner provided by the California Civil Code for the foreclosure of a deed of trust with power of sale . . . ."

Section 3 further provides that an assessment lien "*shall have priority over all liens or claims created subsequent to the recordation of this Declaration [the GCC&R's]*, except for tax liens for real property taxes and assessments in favor of any municipal or other governmental assessing unit and *except for certain trust deeds* as provided in Section 4 below." (Italics added.) Section 4 provides: "The lien for the Assessment provided for herein shall not be subordinate to the lien of any deed of trust or mortgage, <u>except</u> the lien of a first deed of trust or first mortgage . . . (such deed of trust or mortgage being hereinafter referred to as a 'prior deed of trust')."[4]

B. *The Covenants, Conditions, and Restrictions Governing the Bear Creek Development*

The Bear Creek Development is governed by a "master" declaration of covenants conditions, and restrictions, recorded in 1982 (the BCC&R's). Like the GCC&R's, the

---

[4] Section 4 further provides: "The sale or transfer of the Golf Course Property shall not affect any Assessment lien created pursuant to the terms of this Declaration to secure an Assessment due prior to, on, or after the date of such sale or transfer . . . ; provided, however, that the sale or transfer of the Golf Course Property pursuant to a judicial foreclosure or foreclosure by power of sale of a prior deed of trust . . . shall extinguish any Assessment lien which has attached and become effective with regard to the Golf Course Property prior to the time of such sale or transfer, and shall prohibit the recordation of any Assessment which became due prior to the date of such sale or transfer; provided, however, that there shall be a lien on the interests of the purchaser at such sale which shall attach, be created and become effective and be foreclosed in accordance with this Declaration and which shall secure any Assessment becoming due after the date of any such sale or transfer. For the purpose of this Section 4, a sale or transfer of the Golf Course Property shall occur on the date of recordation of a deed or other instrument of title evidencing the conveyance of record title to the Golf Course Property.

BCC&R's provide that BCMA shall have the right, but not the obligation, to enter upon and maintain the golf course property in the event its owner fails to maintain it, and grants BCMA the right, but not the obligation, pursuant to the GCC&R's, "to levy assessments against the Golf Course Property for the payment of such maintenance." The BCC&R's provide: "Such assessments shall, pursuant to the [GCC&R's], become a lien against the Golf Course Property *and shall have the priority* and enforcement rights set forth in the [GCC&R's]." (Italics added.)

C. *The Third Deed of Trust, Assessment Lien, and 2015 Foreclosure Sale*

On September 12, 2013, when Bear Creek Partners LLC (BCP) owned the golf course property, SCI's third deed of trust, securing BCP's $350,000 promissory note to SCI, was recorded against the golf course property. On August 29, 2014, BCMA recorded a "Notice of Delinquent Assessment Lien" against the golf course property (the assessment lien). The assessment lien states it was being recorded in accordance with the GCC&R's *and* section 5675 of the Davis-Stirling Common Interest Development Act (the Davis-Stirling Act). (§§ 4000-6150.)

Notwithstanding the reference in BCMA's assessment lien to section 5675, the parties and we agree that the Davis-Stirling Act does not apply to the golf course property. Section 5675 states that an "assessment" on an owner's separate interest within a common interest development "shall be a lien on the owner's separate interest . . . *from and after the time . . . a notice of delinquent assessment*" *is recorded.* (Italics added.) Thus, if the Davis-Stirling Act applied to the golf course property, BCMA's assessment

6

lien would be subordinate to SCI's third deed of trust pursuant to section 5675, or former section 1356. (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1099-1100 (*Thaler*).) Although the Bear Creek Development is a common interest development within the meaning of the Davis-Stirling Act (§§ 4100, 4175), the BCC&R's show that the golf course property is *not part of* the Bear Creek Development. Thus, the golf course property is not a "separate interest" or separately owned lot, parcel, or space, within the Bear Creek Development. (§§ 4185, subd. (a)(3), 5675.)[5]

BCMA's assessment lien secured $171,460 through August 18, 2014, including $168,557 for costs incurred by BCMA in replacing a parking lot and irrigation on the golf course property. BCP did not pay the assessment lien, and in December 2014 BCMA recorded a notice of default and election to sell the golf course property pursuant to the power of sale granted by the GCC&R's.

Meanwhile, SCI instituted nonjudicial foreclosure proceedings on the third deed of trust. A notice of sale was recorded in November 2014, stating that $1,657,084.13 was owed on the third deed of trust and setting a trustee's sale on December 24, 2014. Before the noticed trustee's sale date, BCP filed for bankruptcy, but SCI obtained relief from the

---

[5] At our direction, the parties submitted letter briefs addressing whether the Davis-Stirling Act applies to the Bear Creek Development and whether the golf course property is a separate interest within that development. In its letter brief, SCI asked us to take judicial notice of BCMA's articles of incorporation and the BCC&R's. We deny these requests as moot. The BCC&R's are already part of the record on appeal, and show the golf course property is not part of, or a separate interest within, the Bear Creek Development.

bankruptcy stay and purchased the golf course property at its postponed foreclosure sale on July 9, 2015.

SCI then sold part of the golf course property in a private sale, and the escrow company for that sale, Ticor Title Company (Ticor), requested payoff demands from BCMA and all other holders of liens against the golf course property. BCMA demanded $475,937.60 from Ticor to pay its assessment lien in full.[6]

Ticor withheld approximately $703,000 from the escrow for SCI's private sale, comprised of BCMA's $475,937.60 payoff demand plus 50 percent of that amount. SCI posted a bond with Ticor in lieu of paying BCMA's payoff demand for its assessment lien through the escrow. SCI later demanded that BCMA release its payoff demand, BCMA refused do so, and SCI advised BCMA that its assessment lien had been extinguished in the foreclosure sale. BCMA disputes that claim.

D. *The Pleadings: BCMA's Complaint and SCI's Cross-complaint*

1. BCMA's Complaint

In September 2015, BCMA filed a complaint for declaratory relief against SCI, alleging the parties had a genuine controversy regarding the priority of BCMA's assessment lien over SCI's third deed of trust. BCMA alleged its assessment lien had priority based on the GCC&R's, which provided that all deeds of trust except first deeds

---

[6] BCMA's $475,937.60 payoff demand included $168,557 for the costs of replacing a parking lot and irrigation on the golf course property, $16,624.80 in "[i]nterest on [p]rincipal," $16,090.60 in "[c]ollection costs," $250 in "[c]losing [c]osts," and $291,040 in attorney fees incurred in the bankruptcy proceedings. We express no opinion whether any of these costs were reasonably incurred.

8

of trust would be subordinate to any assessment lien for maintaining the golf course property. The complaint alleged SCI failed to pay the assessment lien after foreclosing on its third deed of trust, and Ticor, the escrow company for SCI's subsequent private sale of the golf course property, would not release funds to BCMA to pay the assessment lien without "a judgment stating that the [assessment lien] was not extinguished by [SCI's] foreclosure." Thus, BCMA sought a judicial declaration that its assessment lien was not extinguished by the foreclosure sale, that SCI's third deed of trust was subordinate to the assessment lien, and that BCMA was entitled to recover attorney fees and other costs as part of its assessment lien.

2. SCI's Cross-complaint

In November 2015, SCI cross-complained against BCMA, alleging SCI's third deed of trust had priority over BCMA's assessment lien because it was recorded first, and that the assessment lien was extinguished in the foreclosure sale. SCI thus sought a judicial declaration that its third deed of trust had priority over the assessment lien, and sought to cancel the assessment lien. The complaint includes copies of the third deed of trust, the notice of trustee's sale for the July 9, 2015, foreclosure sale, BCMA's response to Ticor's request for a payoff demand, and billing statements from BCMA's attorneys supporting the attorney fee portion of BCMA's payoff demand.

E. *The Judgment on the Pleadings*

SCI moved for judgment on the pleadings, claiming BCMA's complaint did not state a cause of action. (Code Civ. Proc., § 438, subd. (c)(1).) The court granted the

9

motion without leave to amend and entered judgment cancelling the assessment lien, stating that BCMA's complaint failed to state a cause of action, that BCMA would take nothing by its complaint, and that BCMA had no defense to SCI's cross-complaint. BCMA appeals.

## III. DISCUSSION

### A. *Standard of Review*

A motion for judgment on the pleadings may be made on the ground the complaint fails to state a cause of action. (Code Civ. Proc., § 438, subd. (c)(1).) The motion is equivalent to a general demurrer and is governed by the same de novo standard of review. (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.) In reviewing the motion, we deem true all properly pleaded material facts, but not contentions, deductions, or conclusions of fact or law, and we may also consider judicially noticed matters. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) Our task is to determine, independently of the trial court, whether the challenged pleading states a cause of action. (*Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 322.)

### B. *The Lien Priority Statutes, Overview*

California follows a *first in time, first in right* system or rule of lien priorities which is "modified by the recording statutes." (*First Bank v. East West Bank* (2011) 199 Cal.App.4th 1309, 1313; 4 Miller & Starr, Cal. Real Estate (2017 supp.) § 10:1, pp. 10-9 to 10-10 (4 Miller & Starr).) The rule is expressed in section 2897, which provides: "Other things being equal, different liens upon the same property have priority according

10

to the time of their *creation* . . . ." (Italics added.) The rule "assumes" that a party with a subsequently-created lien had actual or constructive knowledge of "all pertinent facts" concerning a previously-created lien. (4 Miller & Starr, *supra*, at § 10:1, p. 10-11.) Thus, under the rule, a person receiving a deed of trust on real property acquires his or her lien *subject to* all previously-created liens and encumbrances of which the person has actual or constructive knowledge. (*Ibid.*; §§ 1213, 1217.)

The recording statutes (§§ 1213-1220) "generally do not govern either the creation or the relative priority of interests in real property." (4 Miller & Starr, *supra*, at § 10:1, p. 10-11.) "Rather, they affect the priority of interests [in real property] by defining when a person is deemed to have *constructive notice* of another interest in the property." (*Id.* at § 10:1, p. 10-12, fn. omitted.) "A properly recorded conveyance of real property . . . serves as constructive notice of its contents to all subsequent purchasers and encumbrances. (§ 1213[]),″ and, "a conveyance recorded first generally has priority over any later-recorded conveyance. (§ 1214.)" (*Thaler*, *supra*, 80 Cal.App.4th at p. 1099.)

A "'conveyance'" includes "every instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or [e]ncumbered, or by which the title to any real property may be affected, except wills." (§ 1215; *Thaler*, *supra*, 80 Cal.App.4th at p. 1099.) A conveyance is "perfected," meaning it gives constructive notice of its contents, upon its recordation. (*Thaler*, *supra*, at p. 1100.) The *perfection* of a conveyance is not to be confused with its creation. (See 4 Miller & Starr, *supra*, at § 10:1, pp. 10-11 to 10-12.)

11

The GCC&R's, SCI's third deed of trust, and BCMA's assessment lien are conveyances for purposes of the recording statutes (§ 1215; *Thaler*, *supra*, 80 Cal.App.4th at p. 1099), and all were properly recorded. Thus, SCI had constructive notice of the 1984-recorded GCC&R's when SCI's third deed of trust was recorded in 2013, and BCMA had constructive notice of SCI's third deed of trust when BCMA's assessment lien was recorded in 2014. The GCC&R's created a covenant running with the golf course property, binding on its original owner and all subsequent owners and encumbrancers. (§ 1468; *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 349, 367.)

C. *The Parties' Lien Priority Dispute*

BCMA claims its 2014-recorded assessment lien has priority over SCI's 2013-recorded third deed of trust because the assessment lien was both created *and* perfected in 1984, when the GCC&R's were executed and recorded. We disagree. Pursuant to the GCC&R's, the assessment lien was neither created nor perfected until it was recorded in 2014. Nonetheless, the assessment lien has priority over SCI's third deed of trust, pursuant to the priority and subordination provisions of the GCC&R's.

1. The GCC&R's Did Not Create or Perfect BCMA's Assessment Lien

We first address whether BCMA's assessment lien was *created and thus perfected by* the 1984-recorded GCC&R's. To answer to this question, we must interpret the GCC&R's. "'The same rules that apply to interpretation of contracts apply to the interpretation of CC&R's.' [Citation.]" (*Fourth La Costa Condominium Owners Assn. v.*

*Seith* (2008) 159 Cal.App.4th 563, 575.)  That is, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit."  (§ 1638.)  In addition, we interpret the entire contract, taken together, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (§ 1641.)  "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."  (§ 1643; see generally *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027.)  Contractual provisions are interpreted de novo where, as here, their interpretation turns solely on the language of the provisions and does not involve the credibility of any evidence extrinsic to the provisions.  (*Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)

In section 3(b), titled "Enforcement by Lien," the GCC&R's provide:  "*There is hereby created a claim of lien*, with power of sale, on the Golf Course Property to secure payment to the Association [(BCMA)] of any and all Assessments levied against any and all owners of the Golf Course Property pursuant to this Declaration . . . ."  (Italics added.) If any "delinquency in the payment of any such Assessment" is not paid within 10 days of BCMA's written demand, BCMA "may thereafter elect to file and record a claim of lien" stating the amount claimed for the delinquency.  "Each delinquency shall constitute a separate basis for a demand or claim of lien or a lien, but any number of defaults may be included within a single demand or claim of lien . . . ."  Section 3(b) then provides that "[*u*]pon such recordation of a duly executed original or copy of *such a claim of lien, the*

13

*lien claimed therein shall immediately attach and become effective in favor of the Association [(BCMA)] as a lien upon and against the Golf Course Property.*" (GCC&R's, § 3(b), italics & underlining added.) These provisions make it clear that an inchoate "claim of lien" was created and perfected when the GCC&R's were recorded in 1984, but no actual "lien" or assessment lien was or could be created or perfected against the golf course property until the claim of lien was reduced to an assessment lien and was *recorded*.

BCMA argues its *assessment lien* was created by the GCC&R's statement that "[t]here is hereby created a *claim of lien . . . .*" (Italics added.) We disagree. This argument disregards other GCC&R provisions which state the "claim of lien" does not "attach" to the golf course property or become "effective in favor of" the Association or BCMA "*as a lien upon and against the Golf Course Property*" (italics added), unless and until four contingencies are satisfied: (1) the owners of the golf course property fail to maintain the golf course property in accordance with the GCC&R's; (2) BCMA incurs costs to maintain the golf course property; (3) the owner of the golf course property fails to pay those costs within 10 days of BCMA's written demand; *and* (4) the claim of lien is reduced to a writing, stating its amount, and is *recorded*. (GCC&R's, § 3(b), italics added.)

The GCC&R's as a whole show that its drafters intended to create an inchoate or contingent "claim of lien" in favor of BCMA, upon the 1984 execution and recordation of the GCC&R's. But the GCC&R's did not create a fully-fledged "lien" or "assessment

14

lien" against the golf course property. Instead, they created a procedure for BCMA to follow in order to transform its inchoate or contingent "claim of lien" into an assessment lien, and make that assessment lien "effective in favor of" BCMA. The last contingency required BCMA to *record* its claim of lien against the golf course property for a specified amount, but this did not occur until 2014 when BCMA recorded its notice of delinquency of assessment lien.

Section 4, titled "Subordination to Certain Trust Deeds[,]" supports our interpretation of the provisions of section 3. Section 4 provides that "[t]he lien for the Assessment provided for herein shall not be subordinate to the lien of any deed of trust or mortgage, <u>except</u> the lien of a first deed of trust or first mortgage . . . that is of record as an encumbrance against the Golf Course Property . . . ." This provision does not state that the "claim of lien" shall not be subordinate to other liens.

Section 4 further provides that "[t]he sale or transfer of the Golf Course Property shall not affect any *Assessment lien* created pursuant to the terms of this Declaration to secure an Assessment due prior to, on, or after the date of such sale or transfer . . . ." (Italics added.) It does not state the sale or transfer of the golf course property shall not affect the "claim of lien." In sum, the GCC&R's as a whole show that BCMA's assessment lien was not created or perfected until BCMA's notice of delinquency of the assessment lien was recorded in 2014.

15

2.  The Assessment Lien Does Not "Relate Back" to the GCC&R's

BCMA next claims its assessment lien "relates back" to the 1984 execution and recordation of the GCC&R's because the GCC&R's effectively secured any future costs BCMA incurred in maintaining the golf course property.  In support of this relation back claim, BCMA relies on section 2884, which provides:  "A lien may be created by contract, to take immediate effect, as security for the performance of obligations *not then in existence*."  (Italics added.)  We disagree that the GCC&R's created a presently effective lien securing BCMA's subsequently incurred costs of maintaining the golf course property.

Although a lien may be contractually created to take immediate effect as security for obligations *not then existing* (§ 2884), that is not what occurred in this case.  As we have explained, the assessment lien was not *created by* and did not take "immediate effect," upon the 1984 execution and recording of the GCC&R's.  Rather, the assessment lien was created and became effective in favor of BCMA as a lien against the golf course property in 2014, when BCMA recorded its notice of the delinquency of the assessment lien and all of the other conditions for creating the assessment lien were satisfied.

BCMA relies on *Tapia v. Demartini* (1888) 77 Cal. 383 and *Oaks v. Weingartner* (1951) 105 Cal.App.2d 598 to support its claim that the 1984 execution and recording of the GCC&R's was sufficient to secure any *future costs* BCMA incurred in maintaining the golf course property, including the assessment lien.  *Tapia* and *Oaks* are distinguishable because they involved mortgages for future advances which were created

16

and perfected at the time the mortgages were recorded, not when the future advances were made. In contrast, BCMA's assessment lien was not created or perfected until after BCMA had incurred costs in maintaining the golf course property, and the notice of delinquency of the assessment lien was recorded in 2014.

The parties in *Tapia* disputed whether a mortgage securing a promissory note for $15,000 plus interest had priority over several subsequently-recorded mechanic's liens. (*Tapia v. Demartini*, *supra*, 77 Cal. at p. 384.) At the time the mortgage was executed, the mortgagor owed less than $4,000 on the mortgage, but the mortgage was "executed and delivered with the understanding and agreement" that it would secure payment of the amounts owed when the mortgage was executed plus *future advances* of *up to* the $15,000 amount secured, plus interest. (*Id*. at pp. 384-385.) In holding the mortgage had priority over the subsequently-recorded mechanic's liens *up to* the $15,000 amount, plus interest, the *Tapia* court explained: "It is firmly settled by a long line of decisions that a mortgage, made in good faith to cover future advancements or indorsements, is valid, not only as between the immediate parties to the instrument, but as against subsequent purchasers or encumbrancers, if properly recorded." (*Id*. at p. 386, citing § 2884 & cases.) The *Tapia* court also pointed out that it was unnecessary for the mortgage to have stated the amount it secured. (*Tapia v. Demartini*, *supra*, at p. 387.) The mortgage would have been "sufficiently definite to put subsequent encumbrancers on inquiry" of the amount it secured, if the mortgage had stated that it secured an unspecified amount of future advances. (*Ibid.*)

17

*Oaks* involved a recorded mortgage for an unspecified amount of future advances. (*Oaks v. Weingartner*, *supra*, 105 Cal.App.2d at p. 599.)  The mortgage stated that it secured a $4,178 loan and that it would also secure "'any further or additional loans (not to exceed in the aggregate the sum of $ ____, to be evidenced by a note or notes therefor) . . . .'" (*Ibid.*)  A total of $11,000 in additional loans were made to the mortgagor.  The holders of subsequently-recorded liens claimed the mortgage was only sufficient to secure the $4,178 loan, but the *Oaks* court disagreed.  Following *Tapia*, the *Oaks* court held that the mortgage secured the full amounts advanced, even though those amounts were not stated in the mortgage.  (*Oaks v. Weingartner*, *supra*, at pp. 599-602.)  "By not so filling in the blank the parties elected to place no limitation upon the general covenant."  (*Id.* at p. 600.)

The differences between the mortgages for future advances in *Tapia* and *Oaks* and the GCC&R's are readily apparent.  The mortgages in *Tapia* and *Oaks* plainly stated that they would secure future advances, and their terms were sufficiently definite to impart constructive notice to subsequent encumbrancers of the real properties that they would secure future advances against those real properties.  In contrast, the GCC&R's did not state that they were creating a presently or immediately effective lien in favor of BCMA to secure any future costs BCMA incurred in maintaining the golf course property. (§ 2884.)  Rather, the GCC&R's provided only that BCMA would have an assessment lien against the golf course property if and when an assessment lien for a specified amount was recorded against the golf course property.

18

3.  BCMA's Assessment Lien is Nonetheless Prior to SCI's Third Deed of Trust

BCMA claims that even if the assessment lien was not created or perfected until it was recorded in 2014, it still has priority over SCI's third deed of trust pursuant to the priority and subordination provisions of the GCC&R's.  BCMA argues these provisions modified "default" "first in time, first in right" rule, and rendered SCI's third deed of trust *subordinate* to BCMA's later-recorded assessment lien.  We agree.

The language of the GCC&R's is clear and explicit.  Section 3 provides that an assessment lien "shall have priority over all liens or claims created subsequent to the recordation of this Declaration [of the GCC&R's], except for tax liens for real property taxes and assessments in favor of any municipal or other governmental assessing unit and except for certain trust deeds as provided in Section 4 below."  Section 4, titled Subordination to Certain Trust Deeds, provides:  "The lien for the Assessment provided for herein shall not be subordinate to the lien of any deed of trust or mortgage, <u>except</u> the lien of a first deed of trust or first mortgage . . . ."  The BCC&R's echo these provisions. They provide that any assessments against the golf course property for the payment of maintenance expenses, "shall, pursuant to the [GCC&R's], become a lien against the Golf Course Property and shall have *the priority* and enforcement rights set forth in the [GCC&R's]."  (Italics added.)

These provisions modified the otherwise-applicable "first in time, first in priority" rule of lien priorities.  (§ 2897.)  They constructively notified SCI that any recorded assessment lien against the golf course property would have priority over SCI's third

19

deed of trust—even if the assessment lien was recorded after the third deed of trust was recorded. "Subordination is, strictly speaking, a status, not an agreement . . . . It refers to the establishment of priority between different existing encumbrances on the same parcel of property, *by some means other than* the basic priority involved in the concept of 'first in time, first in priority' . . . ." (*Middlebrook-Anderson Co. v. Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1029-1030, italics added.)

4. Conclusion

The GCC&R's created a covenant running with the golf course property in favor of BCMA, and derivatively, in favor of the Bear Creek Development homeowners, to ensure that the golf course property was maintained in "a clean and attractive condition." (§ 1468; *Citizens for Covenant Compliance v. Anderson*, *supra*, 12 Cal.4th at pp. 349, 367.) To this end, the GCC&R's allow BCMA to maintain the golf course property if its owner fails to do so, and to create and record an assessment lien to secure certain costs incurred in maintaining the golf course property. The GCC&R's further provide that any assessment lien will have priority over all other liens, including deeds of trust, *except* a first deed of trust, recorded at any time after the GCC&R's were recorded. By these provisions, the GCC&R's ensure that the Bear Creek Development homeowners will not have to live near a poorly maintained golf course property with no means of remedying the situation or of adequately securing certain costs incurred by BCMA in maintaining the golf course property. SCI had constructive notice of the GCC&R's when it recorded its third deed of trust against the golf course property in 2013, and SCI is bound by the

GCC&R's.  Thus, BCMA's assessment lien is prior to SCI's previously-recorded third deed of trust.

## IV.  DISPOSITION

The judgment on the pleadings in favor of SCI is reversed.  The parties shall bear their respective costs on appeal.  (Cal. Rules of Court, rule 8.278.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS\
           J.

We concur:

MILLER\
   Acting P. J.

CODRINGTON\
     J.

21

Filed 10/31/18

COURT OF APPEAL – STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

**<u>ORDER</u>**

| | |
|---|---|
| BEAR CREEK MASTER ASSOCIATION,<br><br>     Plaintiff, Cross-defendant and Appellant,<br><br>v.<br><br>SOUTHERN CALIFORNIA INVESTORS, INC.,<br><br>     Defendant, Cross-complainant and Respondent. | E066588<br><br>(Super.Ct.No. MCC1500389)<br><br>The County of Riverside |

THE COURT

A request having been made to this Court pursuant to California Rules of Court, rule 8.1120(a), for publication of a nonpublished opinion heretofore filed in the above entitled matter on October 19, 2018, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

IT IS ORDERED that said opinion be certified for publication pursuant to California Rules of Court, rule 8.1105(b).

<u>FIELDS          </u>
                  J.

We concur:

<u>MILLER        </u>
      Acting P. J.

<u>CODRINGTON   </u>
      J.

1