Filed 1/31/22  Westwood Montserrat v. AGK Sierra de Montserrat CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| WESTWOOD MONTSERRAT, LTD., | C088859, C090081 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0032447) |
| v. | |
| AGK SIERRA DE MONTSERRAT, L.P. et al., | |
| Defendants and Respondents. | |

Plaintiff and appellant Westwood Montserrat, Ltd. (Westwood) is the owner and developer of a common interest residential development.  Title to much of Westwood's property was transferred to defendant and respondent AGK Sierra de Montserrat, L.P. (AGK) following foreclosure on a deed of trust and a trustee's sale.  Days before the sale, however, Westwood recorded an instrument against the project granting it as the project's developer the right to repurchase any lot where construction of a home had not been

1

completed within three years of acquiring title. After the trustee's sale, Westwood continued to own property in the project and was entitled to control the development.

Following the sale, AGK incorrectly asserted it had gained control of the development upon the transfer of title to the property it purchased, and it took actions concerning the development based on its claim of control to the exclusion of Westwood. In addition, three years after the trustee's sale, Westwood notified AGK of its intent to repurchase some of AGK's property pursuant to the recorded instrument because no homes had been completed on those lots. AGK refused to sell.

Westwood brought this action for declaratory relief and damages against AGK and AGK's alleged general partner, defendant and respondent Angelo Gordon Real Estate, Inc. (AGRE) for alleged violations of the development's declaration of covenants, conditions, restrictions, and easements and Westwood's rights under that declaration as the project developer and a property owner. Included in those violations was AGK's refusal to sell back properties in compliance with the recorded instrument.

Following a ruling against Westwood on a motion for summary adjudication and a bench trial on the remaining causes of action, the trial court entered judgment against Westwood. The court granted summary adjudication against Westwood's causes of action for declaratory relief and enforcement of the development's governing documents upon concluding that the recorded instrument authorizing Westwood to repurchase lots was extinguished upon the foreclosure of the deed of trust. Following trial, the court ruled that Westwood's claims for slander of title and breach of the implied covenant of good faith and fair dealing were barred under the doctrine of res judicata. The claims were based on the same primary right that had been adjudicated in an earlier action between the same parties. The court also awarded attorney fees to AGK and AGRE.

Before us, Westwood contends that the foreclosure on the deed of trust did not extinguish the recorded instrument, and that res judicata does not apply. Westwood also challenges the award of attorney fees.

2

We affirm the judgment and the fee award.

## FACTS AND HISTORY OF THE PROCEEDINGS

1.   Facts

Westwood was organized in 2005 to develop a common interest planned residential development in Loomis known as Sierra de Montserrat. The real property was subdivided into 62 lots, all of which were originally held in Westwood's name. Westwood obtained a loan from Comerica Bank to finance the development. The promissory note was secured by a deed of trust.

Westwood recorded a Declaration of Covenants, Conditions, Restrictions and Easements (CC&Rs) for the development on December 8, 2006. At the time Westwood recorded the CC&Rs, Comerica agreed to subordinate its deed of trust to the CC&Rs.

Among other things, the CC&Rs established a homeowners association. The homeowners association was responsible for enforcing the CC&Rs. All lot owners in the project were members of the homeowners association. If the association chose not to bring a legal action to enforce the CC&Rs, any lot owner could do so.

The CC&Rs established a design review committee (DRC). Designs for all project improvements were required to comply with design guidelines and be approved by the DRC. The CC&Rs also authorized the DRC to inspect any improvement and enforce the improvement's approved plans. The DRC was to have three members, and the CC&Rs named the DRC's initial members.

The CC&Rs designated Westwood and under certain conditions Westwood's successors and assigns as the "Declarant." The CC&Rs gave the Declarant certain rights. For example, the Declarant was authorized to name a majority of the members of the DRC after that body's initial members had served.

The Declarant also had a right to enforce the CC&Rs' time requirements. The CC&Rs required lot owners to complete construction of their homes within three years

3

after taking title. Section 2.08 of the CC&Rs gave the Declarant the right to record an instrument against any lot to establish and enforce the obligation to complete construction within a certain time.

Westwood defaulted on its loan on January 17, 2009. Comerica recorded a notice of default in February of that year, and it recorded a notice of trustee's sale in August 2009.

On October 28, 2009, Westwood as the Declarant and pursuant to section 2.08 of the CC&Rs recorded an instrument against all of the lots in the development to enforce the obligation to complete construction within three years. The instrument was entitled a Supplemental Declaration Regarding Construction Obligation and Memorandum of Repurchase Right (Supplemental Declaration). Westwood did not inform Comerica that it intended to record the Supplemental Declaration.

The Supplemental Declaration stated the three-year construction period began to run from the date title to a lot initially passed from Declarant by any means to any person or entity other than the Declarant. In order to enforce this obligation, the Supplemental Declaration gave the Declarant the right to repurchase any lot for which the three-year deadline had passed and construction had not been completed. The purchase price would be the same price the lot owner paid when it acquired the lot from Westwood less unpaid liens and assessments.

Westwood did not cure its default. On November 3, 2009, six days after the Supplemental Declaration was recorded, the trustee held a nonjudicial foreclosure sale and sold 51 of the development's lots to Comerica.

On June 30, 2010, Comerica, now declaring itself to be the Declarant under the CC&Rs, recorded a "Recission of Declaration of Restrictions" (Rescission). By this document, Comerica purported to rescind and cancel the Supplemental Declaration.

On the same day, Comerica sold the 51 lots it had acquired to AGK. In the grant deed, Comerica purported to assign its interest as Declarant under the CC&Rs to AGK.

4

## 2. *Westwood II*

On May 2, 2011, Westwood filed an action against AGK, the homeowners association, and the owners of Lot 16 which the parties refer to as *Westwood II*. (*Westwood Montserrat Ltd. v. AGK Sierra de Montserrat et al.*, Placer County Sup. Ct. No. SCV0029131.) In this action, Westwood alleged that it continued to own eight lots in the development and thus was a member of the homeowners association, and that under the terms of the CC&Rs, it was still the Declarant. It alleged that AGK was willfully and wrongfully holding itself out to be the Declarant based on the purported assignment from Comerica. It also alleged that AGK had asserted that as the Declarant, it controlled the homeowners association and its board. It replaced Westwood's three members of the DRC with persons of its choosing. And the new DRC approved the Lot 16 owners' site plans and site work which did not comply with the CC&Rs.

Westwood sought in *Westwood II* a declaration that it was the lawful Declarant. It also sought a declaration that as the Declarant, it was entitled to all the rights the CC&R's give to the Declarant, including the authority to appoint members to the DRC, and that all lot owners must submit site plans to the Westwood majority-controlled DRC for approval prior to construction.

Westwood, asserting it had the right under the CC&Rs as property owner within the development to enforce the CC&Rs, also sought temporary, preliminary, and permanent injunctive relief enjoining AGK and the Lot 16 owners from violating the CC&Rs and the homeowners association's articles of incorporation and bylaws (collectively, the governing documents), and from engaging in their continuing nuisances. Additionally, Westwood sought incidental and consequential damages according to proof.

AGK moved to compel arbitration and stay the action pursuant to the CC&Rs. The trial court granted the motion on October 21, 2011.

5

### 3. This action

While the arbitration was pending in *Westwood II*, Westwood notified AGK on November 9, 2012, that as the lawful Declarant, it intended to exercise its rights under the Supplemental Declaration to repurchase 10 of AGK's 51 lots. (More than three years had passed since Comerica had acquired the 51 lots at the trustee's sale.) AGK, asserting itself to be the lawful Declarant, allegedly refused to comply with the notice, and it began marketing and selling the 10 lots Westwood sought to repurchase.

Westwood filed this action on January 25, 2013. Its final iteration is the fourth amended complaint. Westwood alleges that Comerica's subordination of its deed of trust to the CC&Rs included subordination to the Declarant's right under section 2.08 of the CC&Rs to record an instrument to enforce the construction time requirement *and* to the Supplemental Declaration which Westwood recorded pursuant to that right after Comerica subordinated its interest to the CC&Rs.

Westwood also alleges that AGK fraudulently and intentionally asserted itself to be the Declarant based on Comerica's invalid Rescission of the Supplemental Declaration and its purported assignment of its rights as Declarant.

The fourth amended complaint asserted causes of action against AGK and AGRE for slander of title and civil conspiracy, breach of contract, breach of the implied covenant of good faith and fair dealing, tort of another, declaratory relief, and enforcement of the governing documents (respectively, the first, second, third, fourth, seventh and eighth causes of action). The complaint also alleged separate causes of action against AGRE for intentional and negligent interference with contractual relations (the fifth and sixth causes of action, respectively). (The action named other defendants who are not before us.) Under its claim for declaratory relief, Westwood sought a declaration that it was authorized, presumably as the Declarant, to record and enforce the Supplemental Declaration.

6

On September 6, 2013, the trial court stayed this action pending resolution of the *Westwood II* arbitration. The court stated, "The court may not allow a second action to proceed if another pending action involves substantially the same controversy between the same parties arising out of the same transaction. [Citation.] Plaintiff in the *Westwood II* case seeks a declaration that it is the subject Development's Declarant. This determination could potentially bar each claim asserted in this case. It is in the interest of justice and avoidance of multiplicity of litigation to stay this action pending resolution of the *Westwood II* case."

4.  *Westwood II* arbitration and confirmation of final award

In the *Westwood II* arbitration, the parties on August 17, 2012, stipulated to forfeit all rights to have *Westwood II* litigated in a court or jury trial, and they agreed that Hon. Cecily Bond (Ret.) would serve as the arbitrator. They later agreed to bifurcate the arbitration. Phase 1 of the arbitration would determine whether Comerica became the Declarant under the CC&Rs by foreclosing on the 51 lots.

Westwood submitted its claim for arbitration on May 6, 2013. It was similar to its *Westwood II* complaint in all material respects. In addition to seeking declaratory relief, it requested injunctive relief and incidental and consequential damages.

Westwood filed an amended arbitration claim on August 30, 2013. Similar to the original arbitration claim in many respects, the amended claim further alleged that the AGK-controlled DRC had approved plans and construction for Lots 8, 10, 18, 29, and 54 in addition to Lot 16 which violated the CC&Rs and the design guidelines.

The amended arbitration claim also explained Westwood's request for damages. Despite asserting numerous times that it had no adequate remedy at law, Westwood sought an award of damages "as a result of the diminution of value to Westwood's properties through the continuous violations to the [governing documents] and AGK's

7

failure to require compliance with the Design Guidelines in all construction activities within the Association."

The arbitrator on October 24, 2013, ruled that Westwood remained the Declarant after the trustee's sale and was the holder of the Declarant's rights.

At the arbitrator's direction, Westwood submitted its Statement of Phase II Issues and Damages (Phase II statement) to set forth the remaining issues to be adjudicated in the next phase of the *Westwood II* arbitration. The Phase II statement identified a number of violations of the CC&Rs and design guidelines on Lots 8, 10, 16, 18, 29, and 54. Westwood sought a declaration that AGK's approvals of those actions violated the CC&Rs, and it sought injunctive relief against the owners of Lots 16, 18, and 54.

The Phase II statement also set forth the monetary relief Westwood sought from AGK as damages for the CC&R violations and AGK's denial of Westwood's Declarant rights. Westwood requested damages in an amount between $850,000 and $1,585,000 to compensate for AGK's "taking" of Westwood's Declarant rights by denying that Westwood was the Declarant and contending that AGK was the lawful declarant.

Westwood also sought $310,000 in damages to compensate for the loss of value in the lots it still owned due to the violations of the CC&Rs that had occurred on other lots and that were approved by AGK. Most of the violations were continuing nuisances that had been constructed and could no longer be abated.

The arbitrator on February 27, 2014, denied Westwood's request for damages. The CC&Rs required that any claim that sought in excess of $250,000 in damages had to be heard by three arbitrators. Westwood's claim sought more than $250,000 and thus could not be determined by a single arbitrator. Moreover, the arbitrator stated that even though Westwood was willing to be limited to an award that did not exceed the threshold, it had not presented a claim for damages in its initial claim, and it repeatedly disavowed damages in its amended claim by asserting it had no adequate remedy at law. The arbitrator stated, "Such damages are beyond the scope of this Arbitrator and at this late

8

date, it would be unduly prejudicial to Respondents to allow consideration of such damages."

The arbitrator limited Phase II to determining whether Westwood was entitled to injunctive or declaratory relief for six construction items on Lots 16 and 54 which Westwood claimed violated the design guidelines and the CC&Rs. Ultimately, on April 2, 2015, the arbitrator determined that AKG had to replace the chimney caps and doors on Lot 54, but it ruled against Westwood on all other issues.

The owner of Lot 54 petitioned the trial court to confirm the arbitrator's final award. Westwood petitioned to vacate the award, contending among other matters that the arbitrator did not resolve all of its claims. On September 16, 2015, the trial court confirmed the arbitrator's final award and denied Westwood's petition to vacate. It found "no evidence that the arbitrator failed to consider the issues raised by Westwood." It also found no evidence that the arbitrator failed to address additional claims Westwood had argued still remained for arbitration, and it found "no showing that the entire controversy could not be adjudicated absent a finding on such claims."

A panel of this court affirmed the trial court's judgment. (*Westwood Montserrat, Ltd. v. AGK Sierra De Montserrat, L.P.* (Sept. 23, 2016, C080395) [nonpub. opn.].) The panel agreed with the trial court that the arbitrator considered all of Westwood's claims in the manner required by law. (*Ibid.*) Remittitur issued on January 17, 2017.

5.     Proceedings in this action

Proceedings in this action resumed after the stay was lifted. The primary issues resolved were whether Comerica's foreclosure extinguished the Supplemental Declaration, and whether the doctrines of res judicata and collateral estoppel based on the *Westwood II* judgment barred Westwood from recovering in this matter.

9

### a. Extinguishment of the Supplemental Declaration

AGK and AGRE (collectively "respondents" where appropriate) moved for summary judgment and summary adjudication. They claimed, among other arguments, that Comerica's nonjudicial foreclosure had extinguished the Supplemental Declaration. The trial court on June 26, 2017, agreed with respondents and granted summary adjudication on Westwood's seventh cause of action for declaratory relief and its eighth cause of action for enforcement of governing documents, and on respondents' affirmative defenses against all causes of action for extinguishment of a junior lien. *The court found that the Supplemental Declaration constituted a separate conveyance of a property interest which was recorded later in time than Comerica's deed of trust and to which Comerica had not subordinated its interest. The Supplemental Declaration was thus extinguished by Comerica's foreclosure on its deed of trust.*

*Westwoo*d had argued that because Comerica subordinated its interest under the deed of trust to the CC&Rs, it agreed to subordinate to the Supplemental Declaration, which the CC&Rs authorized the Declarant to record. The trial court rejected this argument. While Comerica had agreed to subordinate to the CC&R's provisions, it had not agreed to subordinate to subsequent encumbrances. The Supplemental Declaration was an encumbrance which was created only upon its recordation, which occurred after the deed of trust had been recorded. Because the deed of trust was first in time, the foreclosure extinguished the Supplemental Declaration.

### b. Res judicata and collateral estoppel

On March 15, 2018, the trial court held a bifurcated bench trial on respondents' eighth affirmative defenses, collateral estoppel and res judicata based on the final judgment in *Westwood II*. AGK had earlier raised this issue in a demurrer in 2015 against Westwood's second amended complaint after the arbitrator in *Westwood II* had issued her final award. Among other things, AGK claimed that Westwood's slander of

10

title cause of action was barred by res judicata because Westwood was seeking damages based on its right to be the Declarant, an issue that was resolved in *Westwood II*.

The trial court on January 12, 2016, overruled the demurrer, ruling that res judicata does not apply in the case of a declaratory judgment. It stated, "In the prior action, with respect to the issue of declarant rights, [Westwood] sought only declaratory relief, and is therefore not barred from seeking monetary relief in this action. While defendants point out that [Westwood] also sought and received injunctive relief, the injunctive relief claim was unrelated to the issue of whether [Westwood] was the Declarant."

On July 3, 2017, AGK filed a motion for judgment on the pleadings, by then the fourth amended complaint, based on res judicata and collateral estoppel. The trial court denied the motion because it was based on the same ground made in the demurrer to the second amended complaint.

By the time of trial, only two causes of action remained against respondents: the first cause of action for slander of title and the third cause of action for breach of the covenant of good faith and fair dealing. The trial court found that res judicata barred the remaining causes of action against AGK: "[T]he current suit involves (1) the same cause of action [or primary right] (2) between the same parties (3) after a final judgment on the merits in the first suit." The court also determined that even though AGRE was not a party in *Westwood II*, Westwood was judicially estopped from arguing that AGRE was not AGK's alter-ego. As AGK's alter ego, AGRE was in privity with AGK, and thus res judicata barred the remaining causes of action against AGRE. The court entered judgment of dismissal on January 30, 2019. Appeal no. C088859 is Westwood's appeal from the judgment.

AGK and AGRE each filed motions for attorney fees under Civil Code section 5975 and the attorney fees provision in the CC&Rs. The trial court found that both parties were prevailing parties under both provisions. It awarded $740,471.75 in attorney

11

fees to AGK and $156,878.10 to AGRE. Appeal no. C090081 is Westwood's appeal from the attorney fee order.

We consolidated the appeals for purposes of argument and decision.

DISCUSSION

APPEAL NO. C088859

I

*Extinguishment of Supplemental Declaration*

Westwood contends the trial court erred in granting summary adjudication on its causes of action for declaratory relief and enforcement of governing documents. It claims the court's determination that the Supplemental Declaration was not entitled to priority over the deed of trust, on the ground it was an encumbrance recorded later in time, was in error because Comerica subordinated its priority to the later-recorded Supplemental Declaration by subordinating its deed of trust to the CC&Rs, which authorized Westwood to record the Supplemental Declaration at a later date.

"A lien is a charge imposed in some mode other than by a transfer in trust upon specific property by which it is made security for the performance of an act." (Civ. Code, § 2872.) When a property is encumbered with two liens, one lien is senior to, and has priority over, the other lien. When the senior lien is foreclosed, the sale of the security extinguishes all junior liens. (4 Miller & Starr, Cal. Real Estate (2021 supp.) § 10:1.)

To determine which lien has priority, "California follows a *first in time, first in right* system or rule of lien priorities which is 'modified by the recording statutes.' (*First Bank v. East West Bank* (2011) 199 Cal.App.4th 1309, 1313; 4 Miller & Starr, Cal. Real Estate (2017 supp.) § 10:1, pp. 10-9 to 10-10 (4 Miller & Starr).) The rule is expressed in [Civil Code] section 2897, which provides: 'Other things being equal, different liens upon the same property have priority according to the time of their *creation* . . . .' (Italics

12

added.)  The rule 'assumes' that a party with a subsequently created lien had actual or constructive knowledge of 'all pertinent facts' concerning a previously-created lien. (4 Miller & Starr, *supra*, § 10:1, p. 10-11.)  Thus, under the rule, a person receiving a deed of trust on real property acquires his or her lien *subject to* all previously created liens and encumbrances of which the person has actual or constructive knowledge. (*Ibid.*; §§ 1213, 1217.)

"The recording statutes ([Civ. Code,] §§ 1213-1220) 'generally do not govern either the creation or the relative priority of interests in real property.'  (4 Miller & Starr, *supra*, § 10:1, p.10-11.)  'Rather, they affect the priority of interests [in real property] by defining when a person is deemed to have *constructive notice* of another interest in the property.'  (*Id.*, § 10:1, p. 10-12, fn. omitted.)  'A properly recorded conveyance of real property . . . serves as constructive notice of its contents to all subsequent purchasers and encumbrances.  ([Civ. Code,] § 1213),' and, 'a conveyance recorded first generally has priority over any later-recorded conveyance.  ([Civ. Code,] § 1214.)'  (*Thaler* [*v. Household Finance Corp.* (2000)] 80 Cal.App.4th [1093,] 1099 [(*Thaler*)].)

"A ' "conveyance" ' includes 'every instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or [e]ncumbered, or by which the title to any real property may be affected, except wills.'  ([Civ. Code,] § 1215; see *Thaler*, *supra*, 80 Cal.App.4th at p. 1099.)  A conveyance is 'perfected,' meaning it gives constructive notice of its contents, upon its recordation.  (*Thaler*, *supra*, at p. 1100.)" (*Bear Creek Master Assn. v. Southern California Investors, Inc.* (2018) 28 Cal.App.5th 809, 817-818 (*Bear Creek*).)

Comerica's deed of trust, the CC&Rs, and the Supplemental Declaration were conveyances as each encumbered real property interests.  All things being equal, the deed of trust would have had priority over the CC&Rs and the Supplemental Declaration because it was recorded first in time.  However, parties to a real estate transaction may agree to alter the priorities of encumbrances otherwise fixed by law.

13

An exception to the first in time rule "is when parties enter into a subordination agreement whereby a party agrees to subordinate the priority of his or her lien to another." (*Bratcher v. Buckner* (2001) 90 Cal.App.4th 1177, 1185.) Subordination "refers to the establishment of priority between different existing encumbrances on the same parcel of property, by some means other than the basic priority involved in the concept of 'first in time, first in priority,' or the automatic priority accorded purchase money liens." (*Middlebrook-Anderson Co. v. Southwest Savings & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1030.)

The extent to which a subordination agreement actually subordinates an encumbrance's priority is a matter of contractual interpretation. "[S]ubordination agreements, like contracts in general, are subject to the rule that they must be interpreted to enforce the objective intent of the parties." (*Bratcher v. Buckner, supra*, 90 Cal.App.4th at p. 1186.) "The law is well settled that rights of priority under an agreement of subordination extend to and are limited strictly by the express terms and conditions of the agreement." (*Irvine v. California Cotton Credit Corp.* (1937) 18 Cal.App.2d 761, 763.)

"[T]he language of a contract is to govern its interpretation, if the language is clear and explicit." (Civ. Code, § 1638.) "In addition, we interpret the entire contract, taken together, 'so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' ([Civ. Code,] § 1641.) 'A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' ([Civ. Code,] § 1643; see generally *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027.) Contractual provisions are interpreted de novo where, as here, their interpretation turns solely on the language of the provisions and does not involve the credibility of any evidence extrinsic to the provisions. (*Morgan v. City of Los Angeles Bd. of Pension*

*Comrs.* (2000) 85 Cal.App.4th 836, 843.)" (*Bear Creek, supra*, 28 Cal.App.5th at pp. 818-819.)

Comerica's subordination consists of one sentence. It states that Comerica "consents to all of the provisions contained in the attached Declaration of Covenants, Conditions and Restrictions [the CC&Rs] and agrees that the lien of the Mortgage shall be junior and subordinate and subject to said Declaration."

By this sentence, Comerica altered the priority of its deed of trust lien to be junior to the CC&Rs. As a result, if Comerica foreclosed on its lien, the subsequent purchaser of the property would still be subject to the covenants and restrictions the CC&Rs impose.

However, when Comerica subordinated its deed of trust, it stated it would be junior and subject to the CC&Rs, not to a subsequently recorded encumbrance that was authorized but not created by the CC&Rs. The CC&Rs' covenants and restrictions are equitable servitudes that run with the land and are enforceable in a legal action. (See *County of Butte v. Bach* (1985) 172 Cal.App.3d 848, 867.) Comerica's lien became junior to the CC&Rs in that the CC&Rs, as the designated senior conveyance, would still apply to lots following a trustee sale. The Supplemental Declaration, however, was not part of the CC&Rs. The CC&Rs authorized the Declarant to record an instrument such as the Supplemental Declaration, but that instrument, if it was ever recorded, would be a separate conveyance perfected once its contents were made known. We do not interpret the subordination agreement so broadly as to include within its scope unknown liens and conveyances.

Moreover, the CC&Rs did not state that any later-recorded encumbrance that they authorized would be senior to any party's prior lien. Section 2.08 of the CC&Rs reserved to the Declarant the right to record a separate encumbrance against any lot to establish the lot owner's obligation to complete construction and to establish the Declarant's right to enforce that obligation. Nothing in the section created an encumbrance or addressed such

15

an encumbrance's priority over prior encumbrances. Under the subrogation agreement, Comerica consented only to this right to record a separate encumbrance. It did not subrogate its lien to a separate and later-recorded encumbrance.

Although it did not involve a subrogation agreement, *Bear Creek* concerned a related situation where a deed of trust was junior to a declaration of CC&Rs, and the issue was whether an assessment lien authorized by the CC&Rs which was recorded later than the deed of trust had priority. No party here discussed *Bear Creek* in its briefing. In that case, the recorded CC&Rs for a golf course granted the homeowners association of an adjacent common interest development the right to enter upon the golf course to maintain it if its owner did not. The CC&Rs granted the homeowners association a "claim of lien" with the power of sale in order to reimburse the association for future costs it incurred for maintaining the golf course and which it assessed against the golf course owner. The assessment lien attached and became effective upon recordation of an executed claim of lien. (*Bear Creek, supra*, 28 Cal.App.5th at pp. 812-813.)

The golf course CC&Rs also provided that an assessment lien would have priority over all other liens created after the recording of the CC&Rs except for tax and government liens and the lien of a first deed of trust or mortgage. The assessment lien expressly would not be subordinate to any other deed of trust or mortgage lien. (*Bear Creek, supra*, 28 Cal.App.5th at p. 813.)

Nearly thirty years after the CC&Rs and the first deed of trust were recorded, a lender recorded a third deed of trust against the golf course property in 2013. In 2014, the homeowner's association recorded an assessment lien against the golf course. The lender foreclosed on its lien and acquired the property. The homeowners association sought declaratory relief that its assessment lien had priority over the third deed of trust under the CC&Rs and that the foreclosure sale did not extinguish its assessment lien. The lender in its cross-complaint sought a declaration that its third deed of trust had priority over the assessment lien because it was recorded first and that the foreclosure

16

sale had extinguished the assessment lien.  (*Bear Creek, supra*, 28 Cal.App.5th at pp. 814-816.)

The court of appeal held that the assessment lien had priority.  The lien had priority pursuant to the express priority and subordination terms in the CC&Rs, which modified the first in time priority rule.  (*Bear Creek, supra*, 28 Cal.App.5th at pp. 822-823.)  However, before reaching this holding, the court rejected the homeowners association's other arguments, similar to those Westwood raises here, that the assessment lien had priority due to the CC&Rs' priority.

The homeowners association in *Bear Creek* had argued that the assessment lien was created and perfected when the CC&Rs were recorded years before the third deed of trust was recorded.  The CC&Rs stated that, "there is hereby created a claim of lien." The court held that the argument disregarded the CC&Rs' more specific terms that stated the lien was created and perfected upon its recording.  The court stated:  "The [CC&Rs] as a whole show that its drafters intended to create an inchoate or contingent 'claim of lien' in favor of [the homeowners association], upon the 1984 execution and recordation of the [CC&Rs].  But the [CC&Rs] did not create a fully fledged 'lien' or 'assessment lien' against the golf course property.  Instead, they created a procedure for [the homeowners association] to follow in order to transform its inchoate or contingent 'claim of lien' into an assessment lien, and make that assessment lien 'effective in favor of' [the homeowners association].  The last contingency required [the homeowners association] to record its claim of lien against the golf course property for a specified amount, but this did not occur until 2014 when [the homeowners association] recorded its notice of delinquency of assessment lien."  (*Bear Creek, supra*, 28 Cal.App.5th at pp. 819-820.)

The homeowners association had also argued that the later-recorded assessment lien related back to the recording of the CC&Rs because the CC&Rs effectively secured any future costs the association would incur in maintaining the golf course.  The association relied on Civil Code section 2884, which provides, "A lien may be created by

17

contract, to take immediate effect, as security for the performance of obligations not then in existence." The court of appeal held that the CC&Rs did not create such an assessment lien to take immediate effect. The CC&Rs "did not state that they were creating a presently or immediately effective lien in favor of [the homeowners association] to secure any future costs [the association] incurred in maintaining the golf course property. ([Civ. Code,] § 2884.) Rather, the [CC&Rs] provided only that [the association] would have an assessment lien against the golf course property if and when an assessment lien for a specified amount was recorded against the golf course property." (*Bear Creek, supra*, 28 Cal.App.5th at p. 822.)

*Bear Creek* speaks to the issues in the case before us. Had the CC&Rs in that action not specifically provided that a recorded assessment lien would have priority over any deed of trust recorded after the CC&Rs were recorded except a first deed of trust, the lender's third deed of trust would have had priority because it was recorded before the assessment lien. Although the CC&Rs authorized the assessment lien and had priority over the third deed of trust, the CC&Rs did not of themselves create and perfect the assessment lien. The lien also did not relate back to the recording of the CC&Rs as the CC&Rs provided only a procedure for creating and perfecting an assessment lien in the future.

In the case before us, although the CC&Rs had priority over Comerica's deed of trust under the subordination agreement, they, like the CC&Rs in *Bear Creek*, did not of themselves create and perfect a lien to enforce the construction time limit. They only provided a procedure for creating and perfecting such a lien in the future. Comerica subordinated its lien to the Declarant's right to record an instrument in the future. The CC&Rs were not such an instrument themselves, and Comerica did not subordinate to a separate encumbrance of unknown terms which did not exist at the time of subordination.

18

Further, unlike the CC&Rs at issue in *Bear Creek*, the CC&Rs here contain no language that would give priority to a subsequently recorded encumbrance under section 2.08 over any prior recorded lien.

The trial court relied on *Thaler* as persuasive authority for reaching the same conclusion, and we agree that *Thaler* is also persuasive. In that case, a declaration of CC&Rs recorded in 1984 authorized the homeowners association to levy assessments on individual condominium units. The CC&Rs purported to create a separate and present lien with power of sale against each condominium unit in order to secure payment of the assessments, and it stated that the homeowners association could enforce or foreclose upon the lien as authorized by statute. Under the Davis-Sterling Common Interest Development Act (Civ. Code, § 4000 et seq. (Davis-Sterling Act)), an assessment became a lien when the homeowners association recorded a notice of delinquent assessment. (*Thaler, supra*, 80 Cal.App.4th at pp. 1096-1097.)

A second deed of trust was recorded in 1992. The association recorded an assessment notice against a unit in 1997. The plaintiff acquired the unit at a foreclosure sale arising out of the assessment lien. He alleged the foreclosure extinguished the second deed of trust, and he sought to quiet title. (*Thaler, supra*, 80 Cal.App.4th at p. 1097.)

By statute, the assessment lien was subject to the first in time rule. (*Thaler, supra*, 80 Cal.App.4th at p. 1100.) The court of appeal held that the second deed of trust, which was recorded after the CC&Rs but before the notice of assessment, had priority over the assessment lien, and the plaintiff acquired the property subject to the second deed of trust. (*Id*. at p. 1101.)

The *Thaler* plaintiff argued that because the CC&Rs created a separate and present lien with power of sale, the lien to enforce the assessment either sprang from the lien created by the CC&Rs rather than the recorded notice of assessment, or the notice of assessment related back to the CC&Rs, and thus the holder of the second deed of trust

19

took its interest subordinate to the assessment lien which was eventually foreclosed upon. (*Thaler, supra*, 80 Cal.App.4th at p. 1101.) The court of appeal disagreed. The notice of default, notice of trustee's sale, and trustee's deed of sale each provided that the enforcement of the assessment, the foreclosure sale, and the conveyance of title all occurred pursuant to the recorded notice of assessment, not any lien created at the time of the recording of the CC&Rs. And the governing statute stated that the lien to be enforced was the one perfected upon the filing of the notice of delinquent assessment. Thus, under the first in time rule, the lien created by the notice of assessment was a separate conveyance or encumbrance and was junior in priority to the second deed of trust. (*Id.* at pp. 1101-1102.)

Similarly, the CC&Rs at issue in this action authorized the Declarant to record an instrument against a lot to establish the lot owner's obligation and establish the Declarant's right to enforce the obligation. The authority to record an instrument, however, did not create a lien against the property. The lien was created when the Supplemental Declaration was recorded, and that encumbrance, separate from the CC&Rs, occurred after Comerica had subordinated its interest.

Westwood claims *Thaler* does not apply here because it did not concern the operation of a subordination agreement, and the first in time rule applied in that case as a matter of statute. In *Bear Creek*, however, the court of appeal reached a similar conclusion as the *Thaler* court that the assessment recorded after the third deed of trust was recorded was not created by or did not relate back to the senior CC&Rs even though the third deed of trust was junior to the CC&Rs in all respects just as if it had been contractually subordinated and in the absence of any statute defining when the lien would be deemed to be created and perfected. The differences between *Thaler*, and in particular *Bear Creek*, and this case do not interfere with our finding that the cases are persuasive authority for determining the meaning and scope of Comerica's subrogation agreement.

20

Westwood contends that Comerica's subrogation to the "Declaration" included subrogating to the Supplemental Declaration because the CC&Rs define "Declaration" as the CC&Rs "and its amendments, modifications or supplements." The Supplemental Declaration, however, did not amend or modify the CC&Rs. And although it was entitled a "Supplemental Declaration" and was authorized by the CC&Rs, its language indicates it created a conveyance and a remedy separate from the CC&Rs. The Supplemental Declarations' purpose was to provide notice to any person or entity that may gain title to a lot of the construction timing requirements and the actual enforcement options it set forth. It states that, "Declarant hereby declares and establishes a deadline of three years" for the completion of construction, and that "Declarant hereby establishes its right to enforce [the three-year obligation] separate from and in addition to any enforcement right which the Association may have under the [CC&Rs]. Declarant shall have the right, but not the obligation, to repurchase any" of the lots where construction is not timely completed. Nothing in the terms of Comerica's subrogation agreement indicates it agreed to subordinate its lien to such a separate and severe lien in favor of its defaulting borrower.

Westwood claims the trial court's ruling ignored the express language of the deed of trust which required Westwood to take all action necessary to protect the development. The deed of trust obligated Westwood to "take all other action which may be reasonably necessary or appropriate to preserve, maintain and protect the Trust Estate, including the enforcement or performance of any rights or obligations of Trustor or any conditions with respect to any Rights." This argument seems disingenuous under the circumstances of the Supplemental Declaration's recording. The deed of trust was recorded on January 18, 2006, but Westwood waited until October 28, 2009, to record a conveyance that would give itself the right to reacquire at a below-market price lots it would lose in a trustee's sale six days later. The timing belies Westwood's concern asserted in its brief of

21

recording the Supplemental Declaration "to benefit the integrity of the Development, which would likewise protect the Trust Estate."

Westwood accuses the trial court upon granting summary adjudication of extinguishing Westwood's contractual rights under the CC&Rs to record the Supplemental Declaration. (See *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 237, 242 [court may not approve an amendment to the CC&Rs that would eliminate special rights belonging to the declarant without the declarant's consent].) The trial court did no such thing. The nonjudicial foreclosure extinguished Westwood's right to enforce the Supplemental Declaration. The trial court simply interpreted and enforced the terms of the subrogation agreement and the state's rules of priority.

Westwood further contends that the trial court's ruling results in a logical inconsistency. If Westwood's Declarant rights survived foreclosure, which *Westwood II* found, then it could have recorded the Supplemental Declaration after the foreclosure. In that case, Westwood contends, the timing of the Supplemental Declaration's recording should be immaterial to its validity and priority over the deed of trust because the right to record it was provided in the CC&Rs, which have priority over the deed of trust. We take no position on this argument, as the case before us concerns the Supplemental Declaration which was recorded before the foreclosure.

The trial court correctly concluded that Comerica did not subrogate its deed of trust to the Supplemental Declaration, and the latter was extinguished when Comerica foreclosed on its lien.

II

*Res Judicata*

Westwood contends the trial court erred in holding that its causes of action for slander of title and breach of the implied covenant of good faith and fair dealing were

22

barred by res judicata based on the judgment in *Westwood II*. Westwood claims the court erred because (1) *Westwood II*, as it pertained to determining Declarant rights, was limited to declaratory relief, a judgment which by statute cannot bar further actions for coercive relief such as injunctive and monetary relief on the same primary right; (2) to the extent *Westwood II* sought coercive relief, it did so based on a different primary right than the right at issue here; (3) AGK waived its right to raise res judicata as a defense under the CC&R's cumulative remedies provision; (4) res judicata does not apply because the arbitrator in *Westwood II* lacked jurisdiction to decide Westwood's damage claims that it raises in this action; and (5) AGK should be judicially estopped from asserting the defense of res judicata because of the contradictory position it took against Westwood's damages claims in *Westwood II*.

Res judicata, also known as claim preclusion, "acts to bar claims that were, or should have been, advanced in a previous [lawsuit] involving the same parties." (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824.) Under the doctrine of res judicata, "if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897, fn. omitted (*Mycogen*).)

Claim preclusion arises "if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*DKN Holdings LLC v. Faerber, supra*, 61 Cal.4th at p. 824.)

"To determine whether two proceedings involve identical causes of action for purposes of claim preclusion, California courts have 'consistently applied the "primary rights" theory.' (*Slater v. Blackwood* (1975) 15 Cal.3d 791, 795.) Under this theory, '[a] cause of action . . . arises out of an antecedent primary right and corresponding duty and the delict or breach of such primary right and duty by the person on whom the duty rests.

23

"Of these elements, the primary right and duty and the delict or wrong combined constitute the cause of action in the legal sense of the term . . . ." ' (*McKee v. Dodd* (1908) 152 Cal. 637, 641.)

" 'In California the phrase "causes of action" is often used indiscriminately . . . to mean *counts* which state [according to different legal theories] the same cause of action . . . .' (*Eichler Homes of San Mateo, Inc. v. Superior Court* (1961) 55 Cal.2d 845, 847.) But for purposes of applying the doctrine of res judicata, the phrase 'cause of action' has a more precise meaning: The cause of action is the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced. (See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Insurance Co.* (1993) 5 Cal.4th 854, 860.) As [the California Supreme Court] explained in *Slater v. Blackwood, supra,* 15 Cal.3d at page 795: '[T]he "cause of action" is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. [Citation.] Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief. "Hence a judgment for the defendant is a bar to a subsequent action by the plaintiff based on the same injury to the same right, even though he presents a different *legal ground* for relief." [Citations.]' Thus, under the primary rights theory, the determinative factor is the harm suffered. When two actions involving the same parties seek compensation for the same harm, they generally involve the same primary right. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 954.)" (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797-798.)

A.   Same primary right

The trial court found that this action involves the same parties in *Westwood II* after a final judgment was issued on the merits in that action. Westwood does not challenge either of these findings. The issue before us is whether Westwood's counts for slander of title and breach of the implied covenant in this action seek to adjudicate the same primary

24

right adjudicated in *Westwood II*. We affirm the trial court's finding that they do. The trial court correctly defined the primary right as "Westwood's right to exercise the authority and rights vested in Westwood as declarant under the CC&Rs without interference or harm." In both actions, Westwood sought declaratory and coercive relief based on AGK's usurpation of its Declarant rights, which began when Comerica in the grant deed transferring title in the 51 lots to AGK purported also to transfer the Declarant rights to AGK, and AGK represented itself to be the Declarant.

In the fourth amended complaint in this matter, Westwood alleged that respondents and Comerica recognized that upon foreclosure of the 51 lots, Westwood would continue to be the Declarant. To mitigate that risk, respondents and Comerica agreed that Comerica would record a grant deed that falsely stated Comerica had become the Declarant and that with the grant deed Comerica transferred its Declarant rights to AGK.

In its count for slander of title, Westwood alleges that the filing of the grant deed and the Rescission of the Supplemental Declaration with the Department of Real Estate and the county recorder's office among other things perpetuated the theft of Westwood's Declarant rights and cast doubt on Westwood's title and rights as the Declarant. The publication of the grant deed and the Rescission caused damage to Westwood.

Westwood's cause of action for breach of the implied covenant of good faith alleges that respondents breached the implied covenant contained in the CC&Rs and the Supplemental Declaration by, among other things, refusing to acknowledge Westwood's lawful right as Declarant and by recording the grant deed and the Rescission, interfering with Westwood's exercise of its contractual rights as Declarant. Westwood sought damages.

Turning to *Westwood II*, we find that Westwood pursued the same grievance in that matter as it does here in its counts for slander of title and breach of the implied covenant: relief from AGK's interference with Westwood's rights as the Declarant.

25

In *Westwood II*, Westwood alleged that it was the lawful Declarant. AGK wrongfully held itself out to be the Declarant based on the purported assignment of Declarant rights by Comerica. AGK claimed that as Declarant, it controlled the homeowners association and its board of directors. As Declarant, AGK also replaced Westwood's members of the design review committee with people of its choosing, and this "illegitimate" design review committee was reviewing development applications. All of these actions violated the CC&Rs.

Westwood sought a declaration in *Westwood II* that it was the Declarant. It also sought a declaration that as the Declarant, Westwood was entitled to appoint a majority of members to the DRC, and that all property owners were required to submit plans to the Westwood-controlled DRC for approval.

Westwood also sought injunctive relief both as the Declarant and as a property owner. It alleged that as the Declarant and the majority controller of the DRC, it would suffer irreparable harm by AGK continuing, among other things, to prevent Westwood from acting and maintaining its authority as the Declarant and majority controller of the DRC, including its interfering with Westwood's rights as the Declarant to interpret and enforce the governing documents and appoint members to the DRC. *Westwood II* also alleged that AGK's refusal to recognize Westwood as the Declarant and controlling body of the DRC was a continuing nuisance. It sought injunctive relief to prevent AGK from violating the governing documents and engaging in its continuing nuisance as alleged. Westwood also prayed for incidental and consequential damages.

After *Westwood II* went to arbitration, Westwood filed an arbitration claim that mirrored in all material respects the *Westwood II* complaint. In addition to seeking declaratory relief, it continued to seek injunctive relief and incidental and consequential damages, although no specific claim for monetary damages was set forth.

An amended arbitration claim set forth the same allegations as the first claim. Westwood continued to allege as a ground for injunctive relief that AGK's refusal to

26

recognize Westwood as the Declarant would irreparably harm Westwood by preventing Westwood from acting and maintaining its authority as the Declarant and restricting and undermining its rights under the governing documents. Westwood sought a permanent injunction restraining AGK from acting in violation of the governing documents. Westwood alleged additional violations of the design guidelines by the AGK-approved DRC, and set forth a specific claim for damages based on "the diminution of value to Westwood's properties through the continuous violations to the [governing documents] and AGK's failure to require compliance with the Design Guidelines in all construction activities within the Association." In Phase II of the arbitration, it specifically sought damages for the usurpation of its Declarant rights by AGK.

In its opening brief in this appeal, Westwood admits it sought damages in Phase II of the arbitration based on the denial of its Declarant rights. Westwood states in a later section that it "attempted to include damage claims for Phase II, including damages for taking/loss of declarant rights," and that "the damage claims relating to the Declarant rights that Westwood sought to pursue in Phase II were very similar—if not the same—as the damage claims Westwood had already alleged in the present action . . . ."

It is readily apparent that this action's counts for slander of title and breach of the implied covenant and *Westwood II* arose from AGK's wrongful usurpation and misrepresentation of Westwood's rights as the Declarant. Both actions allege that AGK's wrongful conduct was based on Comerica's purported assignment of Declarant rights to AGK in the grant deed. Both actions sought injunctive and monetary relief based on that primary right. Slander of title and breach of the implied covenant were just two of the counts that arose from AGK's alleged violation of Westwood's right to act as the Declarant, the primary right adjudicated in *Westwood II*. Res judicata bars their adjudication here.

Westwood contends res judicata does not apply for a number of different reasons. We address each.

27

B. Code of Civil Procedure section 1062

Westwood bases two of its arguments on the effect of Code of Civil Procedure section 1062 (section 1062). That statute provides that no judgment for declaratory relief "shall preclude any party from obtaining additional relief based upon the same facts." This statutory exception to the res judicata doctrine is narrow. It "carves out an exception to the bar of res judicata only where a plaintiff's initial action seeks *purely* declaratory relief." (*Mycogen, supra*, 28 Cal.4th at p. 897.) If the initial action sought and received declaratory relief and coercive relief, such as an injunction, damages, or specific performance, section 1062 does not apply and res judicata bars the plaintiff from seeking additional relief based on the same cause of action, even when the relief provided in the initial action is primarily declaratory. (*Id*. at pp. 897, 901.)

Westwood argues that this action qualifies for the exception to res judicata provided by section 1062 because *Westwood II*, to the extent it concerned Declarant rights, was limited to seeking declaratory relief. Phase I of the arbitration was explicitly limited to determining who was the Declarant under the CC&Rs. After the arbitrator concluded Westwood was the Declarant, Westwood brought this action to recover damages for the deprivation of its Declarant rights by AGK. Westwood contends that this action was seeking the "additional relief based upon the same facts" which section 1062 expressly allows.

Westwood misstates the record. *Westwood II* did not seek only declaratory relief concerning Westwood's rights as the Declarant. As explained above, the complaint and its arbitration claim sought injunctive and monetary relief for the same primary right. *Westwood II* sought injunctive relief to prevent AGK from acting as the Declarant and from interfering with Westwood's rights as the Declarant, including the right to appoint the DRC. In the arbitration, Westwood also sought damages to recover the value for the Declarant rights taken from it by AGK.

28

Alternatively, Westwood contends that section 1062 applies only to relief sought on the same primary right or cause of action, and that Phase II of the *Westwood II* arbitration wherein it sought injunctive and monetary relief was based on a different primary right than the primary right at issue in Phase I.  In its opening brief, Westwood states, "Westwood acknowledges that its claims in this current action involve the same primary right as the primary right at issue in Phase I of the Arbitration, its Declarant rights—but Phase II of the Arbitration involved an entirely different primary right than the primary right at issue in this action, such that the safe harbor of Section 1062 applies and no improper claim splitting occurred."  Westwood asserts that in Phase I, it sought declaratory relief on the issue of its Declarant rights.  In Phase II, it sought injunctive and monetary relief to enforce a different primary right; that as an owner and member of the homeowners association, it was entitled for itself and on behalf of the association to enforce the architectural guidelines in the development.  Westwood states that the arbitrator limited Phase II to whether Westwood was entitled to declaratory or injunctive relief regarding six matters Westwood claimed violated the design guidelines or CC&Rs.

At issue for purposes of section 1062 is whether in any phase of *Westwood II* Westwood sought both declaratory and coercive relief based on AGK's interference with its Declarant rights.  As already explained, Westwood sought both types of relief in *Westwood II* based on the same primary right.  And the arbitrator's decision not to award damages based on Westwood's Declarant rights is not evidence that such damages were not sought or considered.  That Westwood also sought relief based on a different primary right, or that the arbitrator bifurcated trial, denied Westwood's damages claims and limited the issues that Westwood could pursue in Phase II are irrelevant to determining whether *Westwood II* and this action are based on the same primary right.

The record shows that Westwood sought declaratory and coercive relief in *Westwood II* based on the same primary right asserted in the counts for slander of title and breach of the implied covenant in this action:  Westwood's right to enjoy and

29

exercise the Declarant rights exclusively. Under *Mycogen*, because Westwood sought coercive relief as well as declaratory relief in *Westwood II* based on the admittedly same primary right at issue here, section 1062's authority to pursue coercive relief in a second action after obtaining purely declaratory relief in the first action does not apply.

C.     CC&Rs' cumulative remedies provision

Westwood contends that even if both phases of the *Westwood II* arbitration involved the same primary right, res judicata would still not apply because AGK, by being subject to the CC&Rs' cumulative remedies provision, waived any res judicata defense.

Section 8.06 of the CC&Rs addresses cumulative remedies. It states, "The respective rights and remedies provided by this Declaration or by law shall be cumulative, and the exercise of any one or more of such rights or remedies shall not preclude or affect the exercise, at the same or at different times, of any other such rights or remedies for the same or any different default or breach or for the same or any different failure by any Owner or others to perform or observe any provision of this Declaration." Westwood argues that this provision authorized it to split a cause of action in separate proceedings, and that AGK, by being subject to the provision, agreed that Westwood could split a cause of action, effectively waiving a defense of res judicata.

We disagree with Westwood's reading of the clause. The clause established that the rights and remedies set forth in the CC&Rs were not intended to be exclusive. It did not, however, constitute a waiver by AGK of the defense of res judicata against the exercise or pursuit of any right or remedy. As the California Supreme Court has explained "in various contexts, ' "waiver" means the intentional relinquishment or abandonment of a known right.' (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048; see *Waller v. Truck Insurance. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.) Waiver requires an existing right, the waiving party's knowledge of that right, and the party's

30

'actual intention to relinquish the right.' (*Bickel*, at p. 1053.) ' "Waiver always rests upon intent." ' (*City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107.) The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 598; see *Waller*, at pp. 31, 33-34.)" (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475.)

Nothing in the CC&Rs' cumulative remedies clause or respondents' conduct establishes that AGK intended to waive, or actually waived its right to raise the defense of res judicata in this action.

### D. Arbitrator's <u>lack</u> of <u>jurisdiction</u>

Westwood argues that res judicata does not apply here because the *Westwood II* arbitrator lacked jurisdiction to grant Westwood's requested damages. The arbitration was conducted pursuant to article 8 of the CC&Rs. Section 8.13.C(1) authorized binding arbitration and required the dispute to be heard by three arbitrators if the claimed amount exceeded $250,000. The arbitrator denied Westwood's damages claims in part because they exceeded $250,000, which was beyond her authority. Westwood contends that res judicata cannot apply in this action because the arbitrator in *Westwood II* ruled that the claims were beyond the scope of the arbitration.

Westwood cites to a decision from this court to support its argument. In *People v. Damon* (1996) 51 Cal.App.4th 958 (*Damon*), a panel of this court held that an administrative hearing's decision against the defendant was not res judicata in a later civil enforcement action against the defendant, even assuming that both actions involved the same primary right, because the remedies in the administrative action by statute could not have been sought in the civil action and vice-versa. (*Id*. at pp. 968-973.)

31

The defendant there argued that the later civil action was barred by the rule against splitting causes of action. This court disagreed, stating that an exception to the rule against splitting claims applied where the two remedies could not both have been sought in one action. The exception, cited in the Restatement, Second, of Judgments, states that an exception "exists where the 'plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief . . . .' (Rest.2d Judgments, § 26, subd. (1)(c); [citation].)" (*People v. Damon, supra*, 51 Cal.App.4th. at p. 974.) We held that because the remedies sought against the defendant could not both have been sought in one action, the rule against splitting claims did not apply. (*Id*. at p. 975.)

Westwood asserts the same exception applies here because the arbitrator lacked jurisdiction to adjudicate Westwood's damages claims that exceeded $250,000. We disagree with Westwood. Unlike in *Damon*, Westwood could have obtained the relief it seeks in this action in *Westwood II* but for Westwood's own stipulation. No jurisdictional limitation impeded Westwood when it filed the *Westwood II* complaint in superior court. When the matter went to arbitration, no jurisdictional limitation impeded Westwood so long as damage claims that exceeded $250,000 were heard by three arbitrators. But Westwood stipulated to using a single arbitrator. Nothing in the record indicates Westwood was compelled to use a single arbitrator.

As the trial court stated, "Westwood stipulated to one arbitrator. It could have chosen not to. Any limitation in seeking a greater *amount* of damages was self-imposed by Westwood." Because Westwood's claims and requests for damages were sought and could have been heard in *Westwood II*, res judicata bars relitigating those claims in this action.

32

E. <u>Judicial estoppel</u>

Lastly, Westwood contends that respondents are judicially estopped from asserting a res judicata defense. It argues respondents are judicially estopped due to AGK's opposition in *Westwood II* to Westwood's attempts to include damage claims in Phase II for the taking and loss of its Declarant rights, a position that is assertedly inconsistent with respondents' claim here that Westwood could have sought those damages in *Westwood II*.

Judicial estoppel is "sometimes referred to as the doctrine of preclusion of inconsistent positions." (7 Witkin, California Procedure (6th ed. 2021), Judgment, § 366.) The doctrine precludes a party from taking inconsistent positions in separate judicial proceedings. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 181 (*Jackson*).) It is invoked " ' "to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . . 'The policies underlying preclusion of inconsistent positions are "general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings" ' . . . . Judicial estoppel is 'intended to protect against a litigant playing "fast and loose with the courts." ' " ' (*Russell v. Rolfs* (9th Cir. 1990) 893 F.2d 1033, 1037.) 'It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite.' (Comment, *The Judiciary Says, You Can't Have It Both Ways: Judicial Estoppel—A Doctrine Precluding Inconsistent Positions* (1996) 30 Loyola L.A. L.Rev. 323, 327 [ ].)" (*Jackson, supra*, 60 Cal.App.4th at p. 181.)

Judicial estoppel may apply when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first

33

position was not taken as a result of ignorance, fraud, or mistake." (*Jackson, supra*, 60 Cal.App.4th at p. 183.)

Judicial estopped is an " ' "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." [Citation.]' (*Ryan Operations G.P. v. Santiam–Midwest Lumber Co.* (3rd Cir.1996) 81 F.3d 355, 365.)" (*Daar & Newman v. VRL International* (2005) 129 Cal.App.4th 482, 491.) "The courts invoke judicial estoppel to prevent judicial fraud from a litigant's deceitful assertion of a position completely inconsistent with one previously asserted, thus compromising the integrity of the administration of justice by creating a risk of conflicting judicial determinations." (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.) "[I]t should be invoked only in egregious cases. . . . [It] is usually limited to cases where a party misrepresents or conceals material facts." (*California Amplifier, Inc. v. RLI Insurance Co.* (2001) 94 Cal.App.4th 102, 118.) A party's changing legal arguments due to his or her different positions in the two lawsuits may under the circumstances be a reasonable litigation tactic that does not undermine the integrity of the judicial process. (*Ibid.*)

"The determination of whether judicial estoppel can apply to the facts is a question of law reviewed de novo, i.e., independently . . . but the findings of fact upon which the application of judicial estoppel is based are reviewed under the substantial evidence standard of review. . . . [¶] Even if the necessary elements of judicial estoppel are found, because judicial estoppel is an equitable doctrine [citations], whether it should be applied is a matter within the discretion of the trial court [citations]. The exercise of discretion for an equitable determination is reviewed under an abuse of discretion standard." (*Blix Street Records, Inc. v. Cassidy* (2010) 191 Cal.App.4th 39, 46-47.)

The trial court declined to apply judicial estoppel. For it, the key question was whether AGK took the position in *Westwood II* that Westwood had no right to present its damages claim at the arbitration. The evidence indicated AGK did not take that position.

The court found no evidence showing either that AGK took totally inconsistent positions or that AGK misrepresented or concealed material facts.

The trial court did not abuse its discretion in making that determination. At the arbitration, AGK contended that Westwood's claim for damages should be denied for reasons other than Westwood's lack of a right to seek damages. The amended arbitration claim framed the issues presented and the relief requested in the arbitration. AGK argued that Westwood's Phase II statement seeking damages for the interference with Westwood's Declarant rights exceeded the scope of the amended claim.

AGK contended that Westwood did not plead a specific claim for damages in its amended claim but rather asserted numerous times it had no adequate remedy at law. Yet, in its Phase II statement, Westwood "introduce[d] significant monetary damages never before articulated or identified," including "damage from the taking/loss of Declarant rights[.]" AGK asserted that "this new claim and associated damages were not identified or even alluded to in the Amended Demand. In fact, they were affirmatively disavowed."

AGK also argued that Westwood could not pursue these damages because the amount sought exceeded the arbitrator's authority. The CC&Rs authorized a single arbitrator to award no more than $250,000, and Westwood had not sought a larger panel that could have granted the amount of damages it sought.

Further, AGK argued that there had been no agreement by the parties that the issues of liability and damages were to be bifurcated. Damages for Declarant rights could have and would have been heard in Phase I of the arbitration had Westwood sought them. Its attempt to do so in Phase II would unduly prejudice the other parties.

The arbitrator—rightly or wrongly—accepted AGK's arguments and denied Westwood's claim for damages. She ruled that the amount sought exceeded the arbitrator's authority. Also, Westwood did not present a claim for damages in its initial

35

arbitration claim, and it disavowed damages in its amended claim. Considering damages at this late date would be unduly prejudicial to the other parties.

Importantly, neither AGK's arguments nor the trial court's ruling suggested Westwood had no legal right to seek damages in the arbitration. Westwood just did not seek them properly. As a result, AGK's position in *Westwood II* was not totally inconsistent with its position in this action.

Westwood argues that the case of *United Bank & Trust Co. v. Hunt* (1934) 1 Cal.2d 340 (*United Bank*) compels a different result. It does not. In that case, the defendant bank opposed the plaintiffs' motion to consolidate their action filed in Butte County with another, related action the bank had filed against plaintiffs in Yuba County and to amend the pleadings to include all of the allegations raised in both actions. The plaintiffs were concerned that their action did not include all of the claims they had raised in the Yuba action by cross-complaint, and that if trial was held first in their action, the judgment might bar recovery in the Yuba action due to res judicata. The bank opposed the motions to consolidate and amend, and the trial court denied them. Later, in the other action, as the plaintiffs had feared, the trial court granted nonsuit against their cross-complaint based on res judicata from the earlier-decided case. (*Id*. at pp. 341-344.)

Adopting the Third Appellate District's opinion as its own, the California Supreme Court reversed. It ruled that the bank had waived its right to raise the defense of res judicata in its Yuba action by its opposition to the motions to consolidate and amend in the plaintiffs' Butte action. The court stated, "Where counsel by timely notice call to a court's attention the pendency of other proceedings covering kindred matters and strive to have the same embraced within the scope of the inquiry, and such attempt is successfully blocked by opposing counsel and the trial proceeds to the investigation of the specific issue before the court, counsel who were successful in preventing the consolidation of the issues cannot be heard later to object to a trial of the related matters upon the ground of *res judicata*. The course pursued by the court and counsel in the [plaintiffs'] Butte

County case was tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for future adjudication. [Citation.] Litigants cannot successfully assume such inconsistent positions." (*United Bank, supra*, 1 Cal.2d at p. 345.)

The *United Bank* court did not describe the grounds on which the bank opposed and the trial court denied the motions except to say they were "tantamount to an express determination on the part of the court with the consent of opposing counsel to reserve the issues involved for future adjudication." (*United Bank, supra*, 1 Cal.2d at p. 345.) The *United Bank* court reasoned that a waiver of the defense of res judicata as to issues that could have been but were not actually adjudicated in a former action may be established "by showing that although a particular matter was involved in the former action, it was by *consent of the parties* withdrawn from consideration at the trial and did not at all enter into or constitute any part of the verdict of the jury or final determination of that action." (*Id*. at p. 346, italics added.)

Because waiver of the defense of res judicata requires a showing of express consent by the party asserting the defense, it is no surprise that only "a very few cases have held that the defendant in a second action is precluded from asserting res judicata as a defense because of his conduct in prior proceedings. [Citations.] In these cases, the courts have properly noted that defendants cannot inconsistently argue that a claim is not cognizable in the first action and then, in a subsequent proceeding, contend that the same issue should have been raised in the prior litigation. Such a rule is appropriate where 'the course pursued by the trial court and by counsel in an earlier action was tantamount to an express determination on the part of the court with the consent of opposing counsel that certain issues should be reserved for future adjudication, and that the doctrine of res judicata did not apply.' (*Hall v. Coyle* (1952) 38 Cal.2d 543, 546.)" (*Slater v. Blackwood, supra*, 15 Cal.3d at pp. 797-798.)

37

Contrary to Westwood's interpretation of *United Bank*, the case does not stand for the proposition that merely opposing successfully the raising of an issue in the first action is sufficient to establish waiver. Under *United Bank* and its progeny, waiver may occur only when the party asserting the defense in the second action inconsistently argued that the claim was not cognizable in the first action (which we have already determined AGK did not do) or when that party expressly consented that the claim may be raised in the second action and that res judicata would not apply.

Thus, Westwood had to demonstrate that AGK expressly consented to Westwood raising the damages issue in this action. The trial court found that unlike in *United Bank*, "there is no evidence AGK agreed that any of Westwood's damages claims could be reserved and adjudicated in a separate proceeding after the arbitration." Substantial evidence supports the trial court's determination, and we conclude the court did not abuse its discretion by not finding respondents judicially estopped from raising res judicata in this action.

## APPEAL NO. C090081

The trial court awarded attorney fees to AGK and AGRE. It determined they were prevailing parties and were entitled to fees under Civil Code section 5975 (section 5975) and section 8.07 of the CC&Rs. The court awarded fees of $740,471.75 to AGK and $156,878.10 to AGRE.

Westwood does not challenge the reasonableness or the amount of attorney fees awarded. Rather, it contends the trial court applied section 5975 and section 8.07 erroneously and asks us to reverse the award. We conclude the trial court did not abuse its discretion in awarding attorney fees under section 5975 and affirm on that basis. We need not reach Westwood's arguments regarding the trial court's application of section 8.07, as it awarded the same amount of fees under each provision.

38

I

*Standard of Review*

In general, we review a trial court's determination of the prevailing party under section 5975 or under a contractual attorney fee clause for an abuse of discretion. (*DisputeSuite.com, LLC v. Scoreinc.com* (2017) 2 Cal.5th 968, 973 (contractual fee clause); *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 94 (section 5975).)

" ' "However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." ' (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175, quoting *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142.) In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.' (*Carver v. Chevron U.S.A., Inc.*, at p. 142; see *Connerly v. State Personnel Bd.*, at p. 1175 ['Under some circumstances, this may be a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review'].)" (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.)

II

*Section 5975*

The Davis-Sterling Common Interest Development Act (Civ. Code, § 4000 et seq.) "consolidated the statutory law governing condominiums and other common interest developments," such as the one before us. (*Villa De Las Palmas Homeowners Assn. v. Terifaj, supra*, 33 Cal.4th at p. 81.) This law includes a mandatory attorney fee provision, codified as section 5975. The statute reads, "In an action to enforce the

governing documents [such as the CC&Rs here], the prevailing party shall be awarded reasonable attorney's fees and costs." (Civ. Code, §§ 5975, subd. (c); 4150 [governing documents defined].) Once a trial court determines a party in an action to enforce the CC&Rs is the prevailing party under section 5975, "it [has] no discretion to deny attorney fees." (*Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 263.)

Westwood contends the trial court misapplied section 5975 in two respects. First, it argues that section 8.07 of the CC&Rs, which is a discretionary attorney fee clause, prevails over section 5975 and modified the statute to make the attorney fee award discretionary instead of mandatory. Second, Westwood asserts that only one of its eight causes of action was brought to enforce the CC&Rs, but the trial court applied section 5975 to the entire action without analyzing to what extent the statute actually applied. Westwood claims we must reverse and remand for the trial court to make a discretionary decision on attorney fees and whether any should be awarded in this matter.

We disagree with both of Westwood's contentions. Section 5975 is a mandatory remedy independent of any contractual attorney fee clause. The words "shall be awarded" in the statute " 'reflect a legislative intent that [the prevailing party] receive attorney fees *as a matter of right* (and that the trial court is therefore *obligated* to award attorney fees) whenever the statutory conditions have been satisfied.' (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 872.)" (*Salehi v. Surfside III Condominium Owners Assn.* (2011) 200 Cal.App.4th 1146, 1152 [interpreting former Civil Code section 1354 which is now section 5975].) "[T]he statutory award of attorney fees under Civil Code section 1354 [now section 5975] is expressly awarded to the prevailing party (i.e., it is reciprocal); such attorney fees are awarded as a matter of right, and there is no discretion afforded to the trial court in granting or denying such fees, other than as to their reasonableness and amount." (*Chapala Management Corp. v. Stanton* (2010) 186 Cal.App.4th 1532, 1546, italics omitted.)

40

Nothing in section 8.07 of the CC&Rs indicates that the parties intended that provision to supersede or modify section 5975. The section reads, "In any action brought because of any alleged breach or default of any Owner or other party hereto under this Declaration, the court may award to the prevailing party in such action such attorneys' fees and other costs as it may deem just and reasonable." An agreement modifying section 5975 in this instance would amount to a waiver of that statute's mandatory right to attorney fees. Assuming only for purposes of argument that the right to fees under section 5975 may be waived, " '[i]t is settled law in California that a purported "waiver" of a statutory right is not legally effective unless it appears that the party executing it had been fully informed of the existence of that right, its meaning, the effect of the "waiver" presented to him, and his full understanding of the explanation.' (*Bauman v. Islay Investments* (1973) 30 Cal.App.3d 752, 758, fn. omitted.)" (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 389.) Westwood does not direct us to any evidence in the record showing respondents were fully informed of their rights under section 5975 or that section 8.07 constituted a waiver of those rights. Certainly, section 8.07 did not provide the information respondents would need to have in order to waive their rights under section 5975.

Moreover, that attorney fees may not have been mandated under section 8.07 did not affect a party's eligibility to receive fees under section 5975. (See, e.g., *Parrott v. Mooring Townhomes Assn, Inc.* (2003) 112 Cal.App.4th 873, 878-880 [party who could not be awarded attorney fees under terms of contractual fee clause could still be awarded fees under section 5975's predecessor if eligible].)

As to its second argument, Westwood contends that only its eighth cause of action, enforcement of governing documents, actually sought to enforce the governing documents, and that count was decided on summary adjudication. It argues that the trial court failed to determine the extent of section 5975's applicability to each cause of action before it awarded fees.

41

To determine whether an action is one to enforce the governing documents, we give less weight to the form of the complaint "than to the substance of the claims asserted and relief sought . . . ." (*Rancho Mirage Country Club Homeowners Assn. v. Hazelbaker, supra,* 2 Cal.App.5th at p. 260.) A plaintiff "cannot avoid the attorney fees provisions if the essence of the claim falls within the enforcement of the governing documents." (*Salawy v. Ocean Towers Housing Corp.* (2004) 121 Cal.App.4th 664, 671 [complaint not an action to enforce the governing documents because it "contained no claim based on a right or remedy under the governing documents." (*Id.* at p. 670.)].)

A review of the fourth amended complaint's individual counts shows that the essence or gist of each count was to enforce the governing documents, including the CC&Rs and the Supplemental Declaration. Each count sought either to enforce Westwood's rights as the Declarant and as an owner under the governing documents or to obtain relief for defendants' alleged violations of those documents. Westwood's first cause of action alleged respondents, aware of Westwood's Declarant rights, committed slander of title by colluding with Comerica to record a grant deed purporting to transfer the Declarant rights to AGK, and by AGK representing itself to be the Declarant and taking actions pursuant to that authority which violated the CC&Rs.

The second cause of action alleged respondents breached the CC&Rs and the Supplemental Declaration and prevented Westwood from exercising its contractual rights as the Declarant under the CC&Rs by refusing to sell properties back to Westwood in compliance with the Supplemental Declaration. The third cause of action alleged a breach of the covenant of good faith and fair dealing based on the same actions by respondents.

In its fourth cause of action entitled "tort of another," Westwood alleged respondents falsely and maliciously asserted that AGK had acquired the Declarant rights and had refused to acknowledge Westwood as the true Declarant or its right under the Supplemental Declaration to repurchase lots. As a result of these action, Westwood was

required to sue the homeowners association and two of its members "to vindicate its rights as Declarant" and compel enforcement of architectural restrictions contained in the CC&Rs which AGK acting as Declarant had not enforced.

The complaint's fifth and sixth causes of action accused AGRE of intentionally and negligently interfering with contractual relations established by the CC&Rs and the Supplemental Declaration by assisting and encouraging Comerica to record the grant deed that purported to transfer the Declarant rights to AGK and by aiding the other defendants to engage in their alleged unlawful actions, including AGK's violations of the CC&Rs and the Supplemental Declaration.

Westwood's seventh cause of action sought a declaration that as the Declarant, it was entitled to record and enforce the Supplemental Declaration. The eighth cause of action, designated as enforcement of governing documents, sought damages due to respondents' violation of the Supplemental Declaration by refusing to sell lots back to Westwood as the Declarant. In that count, Westwood alleges it has authority to enforce the governing documents.

The gist of each of the complaint's causes of action is that respondents violated the governing documents as well as Westwood's rights under the governing documents as the Declarant and as an owner, and Westwood seeks to enforce those documents and rights with equitable and legal relief. As the prevailing parties in the action, respondents were thus entitled under section 5975 to attorney fees, and the trial court did not abuse its discretion in awarding them.

43

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to respondents AGK and AGRE.  (Cal. Rules of Court, rule 8.278(a).)

 

_____

HULL, Acting P. J.

We concur:

_____

HOCH, J.

_____

KRAUSE, J.